James D. HUBBARD, Respondent,

v.

UNITED PRESS INTERNATIONAL,
INC., et al., Appellants.

No. C6–81–448.

Supreme Court of Minnesota.

Feb. 18, 1983.

Dorsey, Windhorst, Hannaford, Whitney & Halladay, Robert G. Bayer and Michael J. Wahoske, Minneapolis, for appellants.

Faegre & Benson, Jerry D. Snider and Elizabeth L. Taylor, Minneapolis, for respondent.

AMDAHL, Chief Justice.

This is an appeal from Hennepin County District Court. Plaintiff-respondent James Hubbard's (Hubbard's) amended complaint asserts two causes of action from the allegedly wrongful conduct of his employer, defendant-appellant United Press International (UPI). Count I alleges discrimination on the basis of an alcoholism disability in violation of the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1 (1978). Count II alleges the tort of intentional infliction of emotional distress. The district court, upon stipulation of counsel during trial, allowed Hubbard to amend his complaint a second time to add a claim of retaliatory discharge, also under the Human Rights Act, Minn.Stat. § 363.03, subd. 7 (1980). The issue of retaliation was reserved for the court's determination.

The trial lasted 5 weeks and generated some 2,100 pages of testimony and 400 exhibits. UPI's motions for a directed verdict at the close of Hubbard's case, and at the close of the evidence, were denied. After 4 days of deliberation, the jury returned a verdict in plaintiff's favor on the claim of intentional infliction of emotional distress, awarding Hubbard $42,000 in compensatory damages and $115,000 in punitive damages. Sitting in an advisory capacity, the jury also found that UPI had discriminated against Hubbard on the basis of a disability, alcoholism.

The district court entered findings of fact, conclusions of law and order for judgment on the retaliation claim on November 26, 1980, finding UPI liable for retaliation and ordering Hubbard's reinstatement. On that same day, the court entered findings of fact, conclusions of law and order for judgment on the discrimination claim, adopting and incorporating by reference the jury's advisory findings. By order dated January 29, 1981, the Court awarded plaintiff $52,951.25 in attorneys' fees and $1,443.88 in costs.

On April 6, 1981, the district court signed amended findings of fact, conclusions of law and order on Hubbard's claim of discrimination under the Minnesota Human Rights Act. Based on those amended findings, and pursuant to Minn.Stat. § 363.14, subd. 2 (1980), the court ordered Hubbard's reinstatement, and awarded him punitive damages of $1,000, the maximum amount then allowed under the Act. On that same day, the trial court also entered an order-memorandum denying UPI's posttrial motions for judgment notwithstanding the verdict, for additional and amended findings of fact and conclusions of law, for reconsideration of attorneys fees, and for a new trial.

As previously indicated, Hubbard contends that his employer, UPI, discriminated against him on the basis of an alleged disability, alcoholism, and then discharged him in retaliation for his engaging in protected activity to protest that alleged discrimination. In addition, Hubbard asserts that UPI intentionally or recklessly began a continuous "campaign of harassment" against him in 1976, when he disclosed that he was completing a program of treatment for alcoholism, and that UPI thereby intentionally inflicted emotional distress. Because the evidence in this case is voluminous, necessarily detailing the employment relationship over a 5- to 6-year period, we will try to clearly relate the facts by discussing them in chronological succession with intermittent subheadings to distinguish key events.

*Background*

UPI is an international wire service. At all relevant times its newspictures division was headed by Bill Lyon, a company vice president whose office was in New York. The newspictures division was broken into divisions, and Ray Macchini was manager of the central division, including Minnesota, which he administered from his Chicago office. Macchini reported directly to Mr. Lyon. Hubbard was Minnesota newspictures bureau manager, and he reported directly to Macchini and ultimately to Mr. Lyon.

Hubbard was hired by UPI on a full-time basis between 1969 and 1970. He reported directly to Macchini beginning in 1970; first as a one-man bureau chief in Omaha, then as bureau manager in St. Louis, and finally, through appointment in the fall of 1974, as newspictures bureau manager in Minneapolis. As newspicture manager in Minneapolis, Hubbard was responsible for the State-Regional Report, which was a photographic report of news stories, features and sports occurring in Minnesota, western Wisconsin and North Dakota. At all relevant times, Hubbard's employment with UPI was controlled by a collective bargaining agreement.

Prior to his disclosure of his treatment for alcoholism in June 1976, Hubbard made a number of outstanding photographs. Numerous exhibits introduced at trial attest to Hubbard's fine abilities and success as a feature photographer. However, Hubbard's job performance prior to his disclosure of alcoholism was not free of problems. UPI concedes that Hubbard had strong photographic skills, but found fault with his ability to make managerial decisions in running a newspicture operation. UPI management found repeated occasion to criticize Hubbard for ineffectiveness in servicing UPI clients, particularly the Brainerd Dispatch.

On January 21, 1975, Hubbard informed UPI that he was interested in covering the 1976 Olympics. On September 10, Macchini submitted Hubbard's name for consideration for the Olympic games as well as for

the national political conventions to be held in 1976. Macchini recommended Hubbard on the basis of his outstanding photographic abilities. UPI's decision to select Hubbard to cover the Olympics was made on April 29, 1976. On June 19, 1976, Hubbard received expense money to use in covering the Olympics, and airline tickets to Montreal with a departure date of July 7, 1976.

### Disclosure of Alcoholism—June, 1976

On May 25, 1976, and unknown to UPI, Hubbard entered outpatient treatment for alcoholism. Hubbard had been dependent on alcohol since he was 17 years old, and, at the time he entered treatment, he felt that he was continually losing control of himself. Hubbard's alcoholism has been arrested, and he has avoided the chemical since completing his formal treatment in mid-1976.

At some time in mid-June or early July 1976, Hubbard disclosed to Macchini that he was in the tail end of treatment for alcoholism.[1] Macchini expressed surprise at Hubbard's disclosure, said he wished he had been told sooner, and asked that Hubbard keep him informed of the progress of Hubbard's treatment. Macchini then called Bill Lyon in New York to inform Lyon that Hubbard was receiving treatment. Lyon decided immediately to pull Hubbard from the Olympics, and instructed Macchini, in the course of that same phone conversation, to advise Hubbard that he was removed from that assignment. Lyon testified that he made the decision to pull Hubbard from the Olympics because he did not think it would help UPI to have someone there who might be ill, or that it would help Hubbard, whom he wanted to leave in his treatment program.

Macchini then attempted to reach Hubbard, but was unable to do so until the evening of July 6. He told Hubbard not to leave for Montreal in the morning. Hubbard testified that Macchini said he had been talking to Lyon and they "decided

they did not need [Hubbard's] kind of problem at the Olympics." Hubbard further testified that Macchini said he was sorry "we have to do this to you, I know you feel bad." Hubbard was shocked at being pulled from the assignment the evening before his departure, and asked for a letter of explanation. Hubbard cried when Macchini hung up.

On July 7, Macchini wrote Hubbard as follows:

> Thanks for confiding in me concerning your personal problem which indeed has been taxing your work for some time. You said you're at the tail end of the prescribed treatment and thus far the results are good. I'm pleased to hear of your progress, Jim.
>
> Now you must prove to yourself and to us that you are capable of performing your duties as expected of a professional. Show that you can handle the job at home first before attempting to tackle a demanding assignment elsewhere. It is because of this that your name has been removed from the list of staffers going to the Olympics in Montreal.
>
> This, then, offers you the opportunity of resolving the problem once and for all. Be advised that if you should fail to make the grade, your job may be placed in jeopardy.
>
> It's up to you, Jim!

This letter was the first indication that Hubbard received from Macchini that his overall performance had been less than satisfactory and that his job was consequently threatened. Unknown to Hubbard, when Macchini wrote this letter he had been advised of a number of complaints regarding Hubbard's job performance. Ray Doherty, the regional executive responsible for selling UPI's wire and picture service, thought Hubbard was a fine photographer, but lacked news judgment and aggressiveness, and failed to properly service clients or

---

1. There is differing testimony as to when Hubbard disclosed his participation in an alcoholism treatment program to Macchini. According to Hubbard, he told Macchini sometime in mid-June because his outpatient program interfered with his ability to cover night baseball. Macchini thought the disclosure came on July 6, the day before Hubbard was scheduled to leave to cover the Olympics.

keep in touch with the Minneapolis bureau. Beginning in the fall of 1975 and continuing until fall of 1976, Doherty told Macchini that Hubbard should be fired. Also unknown to Hubbard, Arnold Dibble, Minnesota State Editor for UPI, had repeatedly complained to Macchini about Hubbard's performance, suggesting that UPI should either move Hubbard to a different bureau under someone's supervision, or terminate his employment. Hubbard testified that he was shocked by Macchini's letter, and thought it outrageous that he was being discriminated against.

### President Ford Visit—October 1976

In October 1976, Macchini assigned Hubbard to go to Iowa to help cover a campaign visit by President Ford. Hubbard flew into Des Moines the same morning that Ford was to arrive. Although there were no coverage problems, Macchini became upset when he learned that Hubbard had not flown in the night before Ford was to arrive. Macchini therefore wrote Hubbard a second warning letter, finding fault with Hubbard's failure to take an earlier flight to Des Moines and commenting that Hubbard's job performance had not improved since July. Hubbard wrote in response that he had not been told that he had to be there the night before, and that he had discussed with Macchini his plans to fly in on the morning of Ford's visit. Macchini agreed that he had not specifically told Hubbard that he had to be there, but had told him that he would be taking a "hell of a chance" to fly in on the morning of Ford's arrival, because the flight could be delayed. Macchini's letter alarmed Hubbard; he felt that "some sort of campaign was possibly being initiated against" him. In addition to his written response to Macchini, Hubbard wrote his union, and began keeping logs of his activities, which he continued to do until his discharge in 1980.

### Three Day Suspension—April 1977

UPI continued to be disappointed by, and critical of, Hubbard's job performance in the first quarter of 1977. Hubbard was finally suspended on April 28, 1977, for days without pay, and given a final warning that he had "better shape up." The suspension was ordered because, in UPI's judgment, Hubbard was out-of-pocket the weekend of April 14, 1977. "Out-of-pocket" means that UPI could not contact him, and that he had not told the local news office and Chicago pictures that he could not be reached. UPI views being out-of-pocket as a "cardinal sin." Hubbard contested the suspension and explained that he had talked to Macchini by phone a number of times on Friday, had called the Chicago office on Saturday, and had called his Minneapolis office on Sunday evening. Despite these communications, UPI still considered Hubbard out-of-pocket because, although he could call in, neither the local UPI office nor the Chicago office knew how to reach him. Hubbard filed a grievance regarding his suspension, and the matter finally went to arbitration in January of 1978.

### Request for Resignation—October 1977

As indicated in the preceding discussion of the facts in this case, by the summer of 1977, considerable tension existed in Hubbard's employment relationship with UPI. Indeed, in October 1977, Lyon concluded that UPI had just and sufficient cause to dismiss Hubbard. However, he opted to attempt to negotiate a resignation because it is UPI's preferred method of terminating an employee.

At Lyon's direction, Macchini visited Minneapolis on October 13, 1977, for the purpose of asking Hubbard for his resignation. They met and Macchini told Hubbard that "New York" wanted his resignation, and that it would be best if he resigned because if he were fired it would prejudice him in a future job search. Macchini told Hubbard that while he was a good photographer, he was a poor business manager, and that there was no future for him at UPI. Hubbard testified that he was "stunned." Macchini offered Hubbard full dismissal pay and time to find another job. Macchini testified that he did not discuss Hubbard's alcoholism. However, Hubbard remembered Macchini's saying, in response to a question from Hubbard, that he was not sure whether UPI's request for Hubbard's

resignation was prompted by Hubbard's treatment for alcoholism; but that if Hubbard had told Macchini sooner that he was an alcoholic, maybe this wouldn't have happened.

After the meeting, on their way back to the office, Macchini and Hubbard talked for about 3 minutes, but their respective accounts of the substance of this conversation differ. Hubbard recalls Macchini's reiterating that it was in Hubbard's best interests to resign, saying that there was nothing Hubbard could do to save his job, and threatening that UPI would "get him" if it took 5 years. Hubbard testified that he was "extremely bothered" by the fact that he had "just been threatened." Macchini, however, recalls that in this conversation he told Hubbard that one of these days a big story would come along—whether in 1 year or 5 years—and Hubbard would blow it, and he would not be able to save Hubbard's job. Macchini did not see his statement as a threat to Hubbard, but simply as a statement of the way things stood. Hubbard refused to resign.

*Nicaragua Incident—June 1979*

The next major event in this employment relationship is a dispute over a proposed trip by Hubbard to cover the civil war in Nicaragua. In June 1979, Macchini called Hubbard to ask if he wanted to volunteer to cover this civil war, and Hubbard accepted. Hubbard was instructed to meet another UPI picture manager who had volunteered for the assignment, Alex Persons, in Miami, Florida, and to leave for Nicaragua from Miami.

On the trip to Florida, Hubbard read a magazine article about the dangers to newsmen in Nicaragua that renewed his prior concerns regarding his safety on this assignment. When Hubbard arrived in Miami later in the evening of June 27, 1979, to meet with Persons, Persons asked him to change his money into smaller denominations in order to pay off people with "cigarettes, booze and money" to ease their way through checkpoints as they travelled across the country. Hubbard testified that he thought taking liquor, cigarettes and money

into a war-torn country for use as gratuities was insane and unnecessarily dangerous, as well as a breach of professional ethics. Persons testified that such occasional use of gratuities was common among American journalists in Nicaragua, and that he did not consider it improper in any way.

At this point Hubbard was quite apprehensive about leaving for Nicaragua. In an effort to make final arrangements and to get more current information regarding the situation on the scene, Persons managed to get Lou Garcia on a long distance phone line. Garcia was in Nicaragua already; Hubbard and Persons were to go in and replace him and another UPI journalist. Hubbard spoke to Garcia, who said "it's just like covering the riots in Detroit," and that it's "no problem at all." Hubbard had never met Lou Garcia, and he wondered how Garcia could know that he, Hubbard, had covered the Detroit riot years before. After this conversation, Hubbard was very concerned that he was being "set up" by UPI. On cross examination he testified that he felt it was possible that UPI was taking him to Nicaragua as a pretext so that they could have him killed.

Despite these very serious reservations, Hubbard continued to vacillate and it was not until 3 a.m. that he definitely decided not to go. Persons wanted Hubbard to call Macchini at that time, but Hubbard decided to wait until a more decent hour. Persons then called to inform Macchini of Hubbard's decision. When Hubbard returned Macchini's phone messages around 8 a.m., Macchini told him he should have done his homework and made his decision not to go while still in Minneapolis.

Lyon did not know that Hubbard had been asked, or had volunteered, to go to Nicaragua. When informed by Macchini of Hubbard's decision and of the circumstances in which it was made, Lyon was quite upset. Lyon testified that he was upset at the expense incurred in sending Hubbard to Miami, and that he was further upset because Hubbard was supposed to relieve a UPI journalist who was already in Nicaragua, and who had to remain there when

Hubbard didn't go. Lyon wrote Hubbard on July 9 stating that he had thought seriously about discharging Hubbard, and decided not to only because it was a dangerous, voluntary assignment. Lyon commented, however, that the indecisiveness Hubbard displayed showed why he was not a good manager, and suggested that Hubbard look for a job elsewhere, under someone's supervision.

Hubbard wrote in reply that he found Lyon's suggestion of where he should be employed "interesting," but that he preferred to stay on UPI's payroll. Hubbard explained that his decision not to proceed to Nicaragua was based upon "extenuating circumstances." At this point, Lyon and Hubbard each wrote a letter to the other, dated August 2, and these letters apparently crossed in the mails. In his letter, Lyon asked Hubbard to spell out these "extenuating circumstances." In his letter, Hubbard set forth in detail the progression of events which led him to change his mind about the assignment. Lyon didn't believe Hubbard, and wrote the following note in response: "Your August 2d letter to me makes interesting reading. I'm going to tell you what I think really happened: I think you chickened out." Hubbard testified that he was "very upset" when he received Lyon's letter at work: " * * * [S]aying I chickened out is totally erroneous and totally unfair, and it hurt me; it hurt me deeply, and it made me sick."

After the Nicaragua incident, Lyon was committed to securing Hubbard's resignation. On August 10, 1979, in response to inquiry from another management official about what to do with Hubbard, Lyon wrote that "I agree with you wholeheartedly that we are going to have to get rid of Jim Hubbard * * *." In that letter, Lyon stated that: "I don't think our current case for his dismissal is strong enough to hold up

in an arbitration, and the dismissal, when it comes, will certainly go to arbitration." Lyon thought the letters from Macchini to Hubbard earlier in the year were too mild, and he suggested that Macchini cooperate with State Editor Richard McFarland (a recovering alcoholic who had gone through treatment in 1975) to build a record to support Hubbard's dismissal. Lyon concluded:

> All of this has got to be done in writing, and its all got to be made a part of the file. If we do it properly, we can be rid of Hubbard within a couple of months, and more importantly, we will be able to make the dismissal stick.
>
> But frankly, I do not want to go into arbitration with what we have in the record now.

### Thailand Incident—October 1979

Lyon testified at trial that the "crowning blow" leading to Hubbard's termination was a trip Hubbard made to Thailand in October 1979, together with his later efforts to transmit pictures he took on that trip over the UPI wires. Lyon testified that he believed Hubbard's trip violated UPI policy because it was a "freebie" [2] and because, in transmitting his pictures of Thailand, Hubbard engaged in advocacy journalism.[3] Hubbard became a volunteer for the American Refugee Committee (ARC) in the fall of 1979. The ARC is an organization based in Minneapolis which sends medical teams to Thailand and Cambodia to aid Cambodian refugees. In October 1979, the ARC decided to send a group of medical personnel to Thailand in November, aboard a charter flight sponsored by the U.N. Hubbard wanted to accompany the team and "help in the effort" by photographing the actions of the American medical personnel. Hubbard therefore contacted a UPI staff member in New York, Bob

---

2. A "freebie" is UPI parlance for something of value given to a journalist in expectation of coverage. In Lyon's view, the purpose of the policy prohibiting UPI journalists from accepting free junkets is to avoid an appearance of bias or prejudice that might compromise UPI's journalistic integrity.

3. Advocacy journalism occurs when a journalist uses the UPI wires to promote a cause or position in which the journalist has a special interest.

Schnitzlein, and requested permission to cover the event for UPI. Schnitzlein relayed Hubbard's request to Lyon, who responded that Hubbard was not to go.

When told that he would not be allowed to go for UPI, Hubbard used earned compensation and vacation time to go to Cambodia and Thailand, on a flight arranged by the ARC. He did not tell anyone in the UPI newspictures operation that he was taking his vacation to go on this trip. Hubbard did not use UPI credentials and did not represent himself to be with UPI during the Thailand trip. He spent 2 weeks in Thailand and Cambodia photographing refugee camps. Hubbard paid for the round trip flight between Minneapolis and San Francisco, and paid a nominal fee for the flight from San Francisco to Thailand. He also paid for his food and accommodations.

When Hubbard returned to the United States he called Macchini a few days before Christmas to ask if UPI wanted a series of pictures on Thailand and Cambodia for the central division. Macchini said that he had no need for the pictures in his division, but gave Hubbard permission to call New York. Then Hubbard again talked to Schnitzlein and requested $300 to cover the cost of his roundtrip air fair between Minneapolis and San Francisco. Schnitzlein again consulted Lyon for a decision. Lyon assumed that Hubbard had violated Lyon's earlier decision and had gone to Thailand on UPI time, and instructed Schnitzlein to tell Hubbard "no." Schnitzlein then called Macchini, and Macchini called Hubbard and told him that New York was not interested in the pictures. Hubbard asked Macchini if the lack of interest was because of his request for $300, and Macchini told him that he didn't know anything about any $300.

On Christmas Eve, Hubbard moved a series of pictures from Thailand over UPI's wire without checking with any of the management personnel who had previously rejected his offer. Hubbard assumed that the reason UPI did not want his pictures was that he had asked for $300 expenses, and Hubbard was "upset" because he felt this was an inadequate reason to refuse to carry pictures of an event which he considered very important. Hubbard gave an additional reason for moving the pictures, which was that he felt "all they were attempting to do was squash my career and squash any attempt I made at trying to better my career." He also said he had a concern for dying people.

On December 28, Hubbard again transmitted pictures of the Thailand camps over the UPI wire, again without checking with Macchini, Schnitzlein or Lyon. As soon as Macchini came to work in the morning of December 28 and saw the two pictures that Hubbard had moved, he became infuriated and immediately ordered a "mandatory kill" on the pictures. A mandatory kill is an instruction to the client not to use a picture, and it is issued only rarely when there is some misrepresentation, or a wrong caption or wrong identification. As soon as he had issued the mandatory kill, Macchini called Lyon and told Lyon what he had done; Lyon agreed with his actions. When Hubbard saw the mandatory kill he was shocked; he testified that it embarrassed him to an extreme degree in a professional sense, and affected his physical health.

*Events Preceding Discharge—March to June 1980*

In early March 1980, Lyon told UPI's counsel, Jack Novatney, that the time had come to do something about Hubbard. At the suggestion of counsel, Lyon asked Richard McFarland (Minnesota State Editor and Minneapolis Bureau Manager) and Jack Graeme (UPI Regional Executive) to provide written evaluations of Hubbard's performance. They wrote critical evaluations on March 9 and March 7, respectively. In addition, Lyon had a set of notes written by JoAnne Bryne, a Minneapolis newsside staffer, complaining about Hubbard's performance, which he had received unsolicited at the end of January. Lyon wanted to dismiss Hubbard immediately. Novatney, however, advised Lyon not to dismiss Hubbard in mid-March because he was in contact with Hubbard's attorney and hoped to arrange a meeting of the principals. Ac-

cordingly, Lyon sent another letter to Hubbard on March 10, 1980, in which he stated that no one had seen an improvement in Hubbard's performance, and that Hubbard was on "extremely tenuous grounds."

On March 18, Novatney called Hubbard's counsel and told him that Hubbard's discharge was "very close at hand." When Hubbard's counsel raised the possibility of settlement, Novatney responded that UPI would consider it, but that the "most likely result was dismissal." Hubbard's attorney then mentioned, having received Lyon's letter of March 10, that Hubbard would file a discrimination claim.

Hubbard did file a discrimination charge with the Department of Human Rights in April. A factfinding hearing was set before the Human Rights Commission for June 26. On or about June 4, Novatney arranged a meeting of the parties and counsel for the 26th. Hubbard then withdrew his charge and commenced his lawsuit on June 23. Because the factfinding session was consequently called off, the meeting was moved to June 25 to accommodate the parties. An attempt was made at this meeting to negotiate a resignation. When an agreement could not be reached, UPI proceeded to discharge Hubbard effective June 28, 1980.

This case involves three causes of action: (1) intentional infliction of emotional distress; (2) employment discrimination on the basis of a disability in violation of the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1 (1978); and (3) retaliatory discharge, also in violation of the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 7 (1980). Hubbard was successful with all three claims in the court below. We hold that the evidence in the record concerning this employment relationship does not, as a matter of law, rise to the level necessary to sustain any of Hubbard's claims.

1. *Intentional Infliction of Emotional Distress*

In instructing the jury on the nature of the tort of intentional infliction of emotional distress, the trial court adopted the formulation set forth in Restatement (Second) of Torts § 46 (1965), which provides in pertinent part: "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, * * *." The jury found that UPI had intentionally inflicted emotional distress, and awarded Hubbard $42,500 in compensatory damages and $115,000 in punitive damages. It is UPI's position that the independent tort of intentional infliction of emotional distress is not recognized in this state and that, in any event, the record does not support such a cause of action even assuming its viability.[4]

Tort claims seeking damages for mental distress generally have not been favored in Minnesota. We have been careful to restrict the availability of such damages to those plaintiffs who prove that emotional injury occurred under circumstances tending to guarantee its genuineness. With regard to a defendant's intentional conduct,[5]

---

**4.** UPI further contends on appeal that: (1) the trial court erred in allowing testimony regarding events occurring outside the 2-year statute of limitations provided in Minn.Stat. § 541.07(1) (1980); that (2) punitive damages are inappropriate in an action for intentional infliction of emotional distress because, since the quality of the defendant's conduct forms the basis of the action, the rendition of compensatory damages is sufficiently punitive; that (3) the trial court erred in failing to take steps to prevent the jury from allowing its decision on the tort claim to be affected by a consideration of employment acts that constitute issues which are subject to grievance and arbitration and which are consequently preempted under the rule established in *Farmer v. United Brotherhood of Carpenters & Joiners,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); and that (4) the tort claim is precluded by Hubbard's claims under the Minnesota Human Rights Act. Because we hold, as a matter of law, that Hubbard failed to sustain his burden of production in asserting his underlying tort claim, we need not address these further grounds of appeal.

**5.** We recently had occasion to review the propriety of the rule applied in the related context of a cause of action for the negligent infliction of mental distress. *See Langeland v. Farmers*

the general rule in this state has been that compensatory damages for mental distress are only available if the emotional injury is accompanied by a contemporaneous physical injury, or in cases involving the invasion of a legal right which by its very nature is likely to provoke a severe emotional disturbance. This rule was most recently stated by this court as follows:

> It is well established that damages for mental anguish or suffering cannot be sustained where there has been no accompanying physical injury; unless there has been some conduct on the part of defendant constituting a direct invasion of the plaintiff's rights such as that constituting slander, libel, malicious prosecution, seduction, or other like willful, wanton, or malicious misconduct.

*State Farm Mutual Automobile Ins. Co. v. Village of Isle,* 265 Minn. 360, 367, 122 N.W.2d 36, 41 (1963) (citations omitted). The requirements that the mental distress be accompanied by physical injury or be the natural result of some other actionable tort provide added assurance that the alleged emotional injury actually occurred and was intentionally inflicted. Because of our awareness of the need to exercise caution in this area, we have never expressly recognized the tort of intentional infliction of emotional distress as an independent cause of action.[6]

■ Hubbard's argument that his independent claim for intentional infliction of emotional distress should be given full recognition raises the issue of whether contemporaneous physical injury or the allegation of malicious conduct sufficient to constitute an underlying tort is critical to that claim or whether a claim of intentional infliction of emotional distress can stand alone as a separate cause of action. Our past reluctance to provide a direct remedy through the recognition of an independent tort reflects a policy consideration that an independent claim of mental anguish is speculative and so likely to lead to fictitious allegations that there is a considerable potential for abuse of the judicial process. Although our support of the policy of protecting the judicial process from trivial and speculative claims by restricting tort recoveries for mental distress is undiminished, we no longer feel that a rule requiring physical injury or an underlying tort is the most effective way to promote this policy. Rather, it is the view of this court that the problems inherent in allowing recoveries for mental and emotional disturbances can be more clearly and adequately addressed if intentional infliction of emotional distress is recognized as a separate and independent tort. Accordingly, we believe it is appropriate to recognize it in Minnesota at this time.

■ The definition of intentional infliction of emotional distress set forth in Restatement (Second) of Torts § 46(1) (1965), which was applied by the trial court, has gained wide acceptance.[7] Four distinct elements of proof necessary to sustain a claim may be implied from the Restatement definition: (1) the conduct must be extreme

*State Bank of Trimont,* 319 N.W.2d 26, 31–32 (Minn.1982).

6. The trial court based its ruling to the contrary on an assumption that this court had "recognized" the existence of the tort in *Peterson v. Sorlien,* 299 N.W.2d 123 (Minn.1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1742, 68 L.Ed.2d 227 (1981). In *Peterson,* however, the question of the independent existence of such a tort was not before the court on appeal. Accordingly, references in the opinion to the tort are but dicta.

7. One recent commentator noted that the majority of jurisdictions now recognize intentional infliction of emotional distress as an independent tort. Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum.L.Rev. 42, 43 n. 9 (1982). In recognizing this tort as an independent cause of action, many of these jurisdictions expressly rejected the "parasitic" theory which restricted recovery of actions brought within the scope of some previously recognized tort or accompanied by some physical injury. *See, e.g., Hume v. Bayer,* 178 N.J. Super. 310, 317, 428 A.2d 966, 969–70 (1981); *Dickens v. Puryear,* 302 N.C. 437, 452, 276 S.E.2d 325, 332 (1981); *M.B.M. Co. v. Counce,* 268 Ark. 269, 280, 596 S.W.2d 681, 687 (1980); *American Road Service Co. v. Inmon,* 394 So.2d 361, 365 (Ala.1980); *Sheltra v. Smith,* 136 Vt. 472, 475, 392 A.2d 431, 432 (1978).

and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. The commentary to the Restatement emphasizes the high threshold standard of proof required of a complainant before his case may be submitted to a jury. We have previously noted that the type of actionable conduct referred to in the Restatement as "extreme and outrageous" must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Haagenson v. National Farmers Union Property and Casualty Co.,* 277 N.W.2d 648, 652 n. 3 (Minn.1979), *citing* Restatement (Second) of Torts § 46 comment d (1965). A complainant must sustain a similarly heavy burden of production in his allegations regarding the severity of his mental distress. Expounding the meaning of "severe emotional distress," the Restatement commentary says in part that "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Restatement (Second) of Torts § 46 comment j (1965). In explaining both the extreme nature of the conduct necessary to invoke this tort, and the necessary degree of severity of the consequent mental distress, the Restatement's commentary emphasizes the limited scope of this cause of action, and clearly reflects a strong policy to prevent fictitious and speculative claims. Because this policy has long been a central feature of Minnesota law on the availability of damages for mental distress, our adoption of the Restatement formulation [8] as the standard for the independent tort of intentional infliction of emotional distress does not signal an appreciable expansion in the scope of conduct actionable under this theory of recovery. The operation of this tort is sharply limited to cases involving particularly egregious facts.

■ In addressing the issue of whether the trial court erred reversibly in refusing to enter a directed verdict or a judgment notwithstanding the verdict, we are called upon to review the evidence introduced at trial and all legitimate inferences therefrom in the light most favorable to the nonmoving party and to determine whether there is sufficient evidence from which a jury might reasonably return a verdict in the nonmoving party's favor. *Walton v. Jones,* 286 N.E.2d 710, 714 (Minn.1979); *Clark v. Chicago & N.W. Ry. Co.,* 226 Minn. 375, 376–77, 33 N.W.2d 484, 485 (1948). Applying this standard to the case at bar, we find that Hubbard failed to satisfy the prerequisite for a jury determination of his tort claim and, consequently, that the trial court erred in submitting that claim to the jury. Examining the entire record, we find it doubtful that Hubbard met his burden of production with regard to any of the elements of his cause of action. We need not pass upon each element, however, for we find the lack of evidence of extreme and outrageous conduct and of the actual occurrence of severe emotional distress to be dispositive.

■ UPI's conduct in this case consisted of employment discipline and of both written and verbal criticism of Hubbard's job performance. Our review of the nature and content of these actions, all of which focused upon Hubbard's performance of his job, convinces us that they were neither extreme nor outrageous. Hubbard argues that although there may have been no single act that was outrageous, UPI's entire course of conduct taken as a whole is sufficient to hold UPI liable. In support of this, he cites *Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053 (1979), a case in which a series of acts, none of which was actionable individually, was found sufficient to warrant liability for intentional infliction of emotional distress. However, the series of acts which Hubbard identifies in support of his own action cannot be said to rise to the level of outrage present in the *Boyle* case. Nor does any single act by UPI suffice to support this action. Accusing Hubbard of "chickening out" of the Nicaragua trip, though not pleasant, is not an outrageous act. UPI's other actions may have made

8. While we adopt the theory of Restatement (Second) of Torts § 46(1) (1965), the third party issues reflected by subsection (2) are not before us and we do not pass upon them.

Hubbard feel harassed, and may even have been intended to harass, but they do not, even when considered cumulatively, constitute extreme and outrageous conduct "utterly intolerable in a civilized society." Restatement (Second) of Torts § 46 comment d (1965).

Similarly, the primary evidence of Hubbard's emotional distress was his own testimony that "because of" UPI's conduct he "had been depressed," that he had become "physically ill in terms of throwing up, and had stomach disorders," and that he had developed a skin rash and high blood pressure. Despite this testimony about his problems, Hubbard never missed work, never filed a claim for workers' compensation, and never saw a doctor until June 1980, and went then only because he had the flu. Medical evidence as to Hubbard's injuries is conspicuously absent from the record.[9] The extent of the "injury" proven by this record does not exceed that of any employee who experiences an employer's criticism or reproof concerning job performance. Accordingly, the jury should not have been permitted to find that the distress was so severe that no reasonable person could be expected

to endure it. Restatement (Second) of Torts § 46 comment j (1965).

In summary, we conclude, as a matter of law, that on the material facts of this case the trial court erred in permitting the jury to find that UPI's conduct was sufficiently outrageous, or that Hubbard's emotional injury was sufficiently severe, to constitute intentional infliction of emotional distress. Accordingly, we reverse.

### 2. The Discrimination Claim

The district court found that the evidence adduced at trial supported plaintiff's allegations of discrimination on the basis of an alcoholism disability in violation of the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1 (1978). This allegation of discrimination rests upon the proposition that alcoholism is a "disability" within the meaning of the Human Rights Act.[10] UPI argues that the district court's finding that UPI discriminated against Hubbard on the basis of a disability is in error because alcoholism is not a disability within the meaning of the Act, and, in any event, because there is insufficient evidence in the record to support the trial court's findings.[11]

**9.** We have previously noted the need for trial courts to carefully scrutinize evidence presented by plaintiffs in support of their claims regarding the cause and the severity of alleged emotional distress absent a contemporaneous physical injury. In *Johnson v. Sampson*, 167 Minn. 203, 208 N.W. 814 (1926), we emphasized that:

> [T]here is always a possibility of trumped-up claims if there may be a recovery where no evidence of bodily injury can be discovered immediately. However, the matter is in the control of the trial courts, and verdicts for plaintiffs for any substantial amounts, when based chiefly on proof of subjective symptoms, will not usually be allowed to stand.

167 Minn. at 207, 208 N.W. at 816.

**10.** It is a prohibited practice for an employer in Minnesota to discriminate against an employee "with respect to his hire, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because that employee is disabled. Minn.Stat. § 363.03, subd. 1(2)(c) (1978). "Disability" is defined as "a mental or physical condition which constitutes a handicap." Minn.Stat. § 363.01, subd. 25 (1978).

**11.** Prior to its amendment in 1981, the Minnesota Human Rights Act provided that a claim

or civil suit under the Act must be brought "within six months after the occurrence of the practice." Minn.Stat. § 363.06, subd. 3 (1980) (amended by Act of May 29, 1981, ch. 330, 1981 Minn.Laws 1508, 1509). The trial court concluded that Hubbard's claim was not barred by this limitation provision because it found that UPI engaged in a discriminatory practice against Hubbard within 6 months of the filing of his charge of discrimination with the Minnesota Department of Human Rights in April 1980. The only actions of UPI occurring within 6 months of April 1980 that were found by the trial court to be discriminatory were UPI's criticism of Hubbard's trip to Thailand in December 1979 and its reaction to Hubbard's subsequent decision to run pictures taken on this trip over UPI's wires. However, the trial court did not impose liability on the basis of this single act. Instead, it ultimately found that UPI had intentionally embarked on a "campaign of discrimination" in June 1976 which "continued, in one form or another, through and including plaintiff's termination in June 1980," and it imposed liability, in part, on the basis of a number of past discriminatory acts. Accordingly, it seems clear that the trial court's determination that plaintiff's discrimination claim was not barred by the applicable statute of limitations

Our review of the district court's findings in support of its determination that the plaintiff proved his allegations of discrimination is conducted under the clearly erroneous standard set forth in Minn.R. Civ.P. 52.01. *See, e.g., Dodge v. Minnesota Mining and Manufacturing Co.,* 278 N.W.2d 97, 100 (Minn.1979). Under this standard, the findings of the trial court will not be disturbed if they are reasonably supported by evidence in the record considered as a whole. *Peterson v. Johnston,* 254 N.W.2d 360, 362 (Minn.1977). Although the trial court submitted a number of issues regarding Hubbard's discrimination claim to an advisory jury, the findings made are regarded as those of the court sitting without a jury. *See* Minn.R.Civ.P. 39.02; *In Re Murphy's Estate,* 269 Minn. 393, 404, 131 N.W.2d 220, 227 (1964). The clearly erroneous standard is then applied variously depending upon the documentary or oral character of the evidence that bears on the challenged findings. *In Re Trust Known as*

*Great Northern Iron Ore Properties,* 308 Minn. 221, 225–26, 243 N.W.2d 302, 305–06, *cert. denied sub nom., Arms v. Watson,* 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

Because of the substantial similarities in the language and purposes of the two statutes, in construing the Minnesota Human Rights Act this court has applied principles developed in the adjudication of claims arising under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e (1976). *See, e.g., Fisher Nut Co. v. Lewis ex rel. Garcia,* 320 N.W.2d 731, 734 (Minn.1982); *Danz v. Jones,* 263 N.W.2d 395, 398–99 (Minn.1978). The beginning point for discussion of cases brought under Title VII is generally the three-part analysis established by the Supreme Court in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which consists of a prima facie case, an answer, and a rebuttal.[12] Because *McDonnell-*

---

was based on the "continuing violation" doctrine. The continuing violation doctrine has been applied by courts to toll the statute of limitations in employment discrimination actions when the discriminatory acts of an employer over a period of time indicate a systematic repetition of the same policy and constitute a sufficiently integrated pattern to form, in effect, a single discriminatory act. *See, e.g., Brotherhood of Railway and Steamship Clerks v. State,* 303 Minn. 178, 193, 229 N.W.2d 3, 9 (1975). As an additional ground of appeal, UPI argues that nothing about UPI's reaction to the incidents surrounding Hubbard's Thailand trip indicates any discrimination on the basis of a disability, and that Hubbard's claim is barred because he therefore failed to make the showing of a present violation that is necessary for the application of the continuing violation doctrine under the holding of *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In view of our disposition of the merits of Hubbard's discrimination claim, we need not address this further ground of appeal.

**12.** Courts distinguish between "disparate treatment" and "disparate impact" Title VII claims, and have developed different standards for analyzing each. The Supreme Court has defined the two basic types of Title VII cases as follows:

"Disparate treatment" * * * is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race,

color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. * * *

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (citations omitted). In the present action, Hubbard's claim of employment discrimination on the basis of his alcoholism is one alleging a disparity in treatment, rather than disparate impact.

The respective burdens of persuasion and production in discrimination claims under Title VII alleging disparate treatment were specified by the Supreme Court in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Court asserted that the ultimate burden of persuasion rests on the plaintiff at all times. *Id.* at 253, 101 S.Ct. at 1093. First, the plaintiff must present a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 252–53, 101 S.Ct. at 1093. If the plaintiff is successful in establishing a prima facie case, a pre-

*Douglas* concerned an allegation of discrimination based only on an employer's refusal to hire, the specific elements of the *McDonnell-Douglas* court's formulation of the plaintiff's prima facie case must be modified for varying factual patterns and employment contexts.[13] *See, e.g., Kaster v. Independent School District No. 625,* 284 N.W.2d 362, 364 (Minn.1979). The crux of a disparate treatment claim involving an employer's decision to discharge an employee is that the employer is treating that employee less favorably than others on the basis of an impermissible classification. The discharged employee carries the initial burden of establishing a prima facie case by showing (1) he is a member of a protected class; (2) he was qualified for the job from which he was discharged; (3) he was discharged; and (4) the employer assigned a nonmember of the protected class to do the same work.

sumption is created that the employer unlawfully discriminated against the employee. *Id.* at 254, 101 S.Ct. at 1094. The burden of production then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment action. *Id.* The sufficiency of the defendant's evidence is evaluated by determining whether it meets the plaintiff's prima facie case by presenting a lawful reason for the adverse action, and whether it "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255–56, 101 S.Ct. at 1094–95. As indicated, if the employer succeeds in carrying its burden of production the plaintiff has an opportunity to show that the reason for the adverse action stated by the employer is not the real reason, but instead is a "cover" for discrimination. *Id.* at 256, 101 S.Ct. at 1095. At this third and final stage the plaintiff has the ultimate burden of persuading the court, by a preponderance of the evidence, that the defendant intentionally discriminated against him. *Id.* The plaintiff may sustain this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

One distinction between the disparate treatment and disparate impact theories of discrimination concerns the nature and weight of the burden of production which shifts to the defendant after the plaintiff has established a prima facie case. *See Johnson v. Uncle Ben's, Inc.,* 657 F.2d 750, 752–53 (5th Cir.1981). Under the disparate impact analysis, once the plaintiff establishes a prima facie case the employer must affirmatively prove a rational and

*Marks v. Prattco, Inc.,* 607 F.2d 1153, 1155 (5th Cir.1979).

It is questionable whether Hubbard satisfied the requirements for a prima facie showing of discrimination. As an initial matter, we have never decided whether, or to what extent, alcoholism is a "disability" within the meaning of the Minnesota Human Rights Act. Even if we assume, however, that Hubbard is a member of a protected class and that he otherwise met the prima facie test, it is clear that UPI offered legitimate, nondiscriminatory reasons for each of its challenged actions and that, in response, Hubbard failed to meet the burden imposed upon him by the final step of the three-step *McDonnell-Douglas* analysis. Accordingly, we hold that UPI met its burden of production in showing legitimate, nondiscriminatory reasons for its actions

compelling relation between the practice and job performance and show that alternative practices with a lesser discriminatory impact are not available. *Kraft, Inc. v. State,* 284 N.W.2d 386, 387 (Minn.1979); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). The employer in a disparate treatment case need only raise a "genuine issue of fact as to whether it discriminated against the plaintiff" through the introduction of evidence that shows legitimate reasons for rejecting the plaintiff. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

13. Hubbard's discrimination claim is somewhat vague with respect to the specific nature and adverse effects of UPI's allegedly discriminatory conduct. He alleges, and the trial court found, that he was subjected to "constant harassment" and a "continuing pattern of discrimination" beginning in June 1976 and continuing through the date of his discharge in July 1980. Hubbard's allegations, and the trial court's findings, appear at least to encompass claims that he was discriminatorily denied promotion, that he was discriminatorily denied conditions and facilities of employment commensurate with others similarly situated, and that he was discriminatorily discharged. We have chosen to focus upon the discriminatory discharge claim. We note, however, that we would apply the same basic three-step model of pleading and proof regardless of the specific claim of employment discrimination and that, on the facts of this case, we would arrive at the same result.

and that Hubbard failed to carry his overall burden of proof on the basic issue of intentional employment discrimination.[14]

Assuming, arguendo, that Hubbard made out a prima facie case of discriminatory discharge, it is clear that UPI met its burden of production in establishing a legitimate, nondiscriminatory reason for the discharge: inadequate overall job performance.[15] The record in this case consists of evidence concerning instances of discipline and criticism in the employment relationship over some 5 to 6 years. None of UPI's letters of inquiry and criticism, either to Hubbard or internally, criticize Hubbard for drinking or for being an alcoholic and seeking treatment. They criticize only job performance, and specifically concern a perception by management regarding Hubbard's poor news judgment, his failure to coordinate with newsside, and his persistent lack of aggressiveness in servicing clients by providing responsive state coverage. In addition, evidence in support of UPI's contention that its actions were motivated by nondiscriminatory reasons includes testimony from UPI staff members (one of whom was a member of Hubbard's union, and two others who were themselves alcoholics) regarding seriously critical evaluations they made to Hubbard's supervisors regarding his job performance. The record also contains the testimony of three former subscribers to UPI's newspictures service, each of whom testified regarding their dissatisfaction with the picture report they received during the period in which Hubbard was responsible for providing them service. In summary, evidence critical of Hubbard's job performance is considerable, and is not restricted to the testimony of UPI's management. We find that this record contains ample evidence that UPI had legitimate, nondiscriminatory reasons for its actions.

We next turn to the third stage of the *McDonnell-Douglas* formula and review whether Hubbard demonstrated that the reasons stated by UPI for its adverse actions are pretextual, and whether Hubbard otherwise proved that UPI intentionally discriminated against him. In his effort to discredit UPI's evidence of his poor job performance, Hubbard provided evidence of the numerous awards and prestigious coverage he has received as a photographer. This evidence, however, does not show pretext. UPI concedes that Hubbard has strong photographic skills, but finds fault with his ability to perform the management functions necessary to the success of a newspicture operation. Hubbard further argues that his job performance could not have been as inadequate as UPI's evidence suggests because UPI never pursued its remedy under the Wire Service Guild contract by attempting to terminate him for just and sufficient cause. In this regard, the record shows that Mr. Lyon considered going to arbitration on the just and sufficient cause issue in August 1979, but did not because he knew that an arbitrator would not sustain a discharge on primarily oral testimony of poor performance and he felt that UPI did not then have sufficient written evidence in the file. Internal correspondence demonstrates that this was a tactical judgment made in the context of Lyon's overall decision to seek Hubbard's termination due to poor job performance. Therefore, UPI's failure to terminate Hubbard for "just and sufficient cause" does not indicate that UPI was satisfied with Hubbard's performance. We find these efforts to show pretext unpersuasive.

**14.** In so ruling, we are only holding that Hubbard failed to meet the burden of proof imposed upon him by the final step of the three-step *McDonnell-Douglas* analysis. We need not decide whether Hubbard satisfied the first step by establishing a prima facie case. Accordingly, we do not decide whether, or to what extent, alcoholism is a disability within the meaning of Minn.Stat. § 363.01, subd. 25 (1978).

**15.** The trial court failed to expressly apply the three-step *McDonnell-Douglas* formula in its analysis of the evidence presented in this case. However, the record developed at trial is thorough, and the trial judge's findings and explanation of his decision are sufficiently complete to permit us to review the record and the decision below within the *McDonnell-Douglas* framework without vacating the district court's judgment and remanding this matter for new findings.

Hubbard similarly failed to carry his overall burden in proving that UPI intentionally discriminated against him. Among the incidents specified in the trial court's findings as intentionally discriminatory are UPI's responses to Hubbard's trip to Thailand and to his subsequent decision to run pictures taken on that trip over UPI's wires. The trial court found that there was nothing improper or violative of UPI policy with respect to Hubbard's actions in these matters, and that UPI's reactions and criticisms were "unwarranted, extreme and discriminatory * * *." We conclude that there is insufficient evidence to support these findings. Rather, it is clear from the record that UPI acted in response to perceived violations of its policies.

The existence of the two UPI policies at issue in the Thailand incident, the policy against "freebies" and the policy against advocacy journalism, is clearly established by the record. With regard to the policy against "freebies," on the basis of his preliminary investigation of this matter, Lyon reasonably believed that Hubbard had flown free, and had free lodging, during the course of his trip to Thailand. Lyon formed this belief at a time when he mistakenly assumed that Hubbard had gone to Thailand on UPI time. In addition, Hubbard moved pictures from his trip over UPI wires on December 24, 1981, after being told not to on December 21 and at a time when neither Macchini nor Lyon would be working. There is no question that Hubbard was told not to; he wrote in his own log that his request to run these pictures had been denied. If Hubbard thought that he was told no because of his request for $300 in expenses, that was a mistaken assumption on his part, just as Lyon was mistaken when he thought Hubbard had gone to Thailand on UPI time. Upon this record, we find that Lyon had good grounds to believe that he was confronted with a case of a free trip or of advocacy journalism, and that his actions in criticizing Hubbard were motivated by this belief. The record does not support the inference, drawn by the trial court, that UPI's criticism of Hubbard in this incident was moti-

vated by an intent to discriminate against him on the basis of his alcoholism.

We see no need to discuss each incident in this employment relationship which occurred between 1976 and 1981. The record reveals, however, that an intent to discriminate against Hubbard on the basis of alcoholism did not motivate UPI in any of its actions. In summary, after reviewing this record, we are left with a definite and firm conviction that the trial court was mistaken in finding that UPI intentionally discriminated against him. Accordingly, we reverse.

### 3. Retaliatory Discharge

 The third claim presented herein is that Hubbard's discharge was retaliatory in nature and therefore unlawful under Minn.Stat. § 363.03, subd. 7 (1980). The three-part procedure of shifting production burdens set out in *McDonnell-Douglas,* and applied in Title VII suits generally, is also applicable to retaliation claims. *See Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980); *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). In order to establish a prima facie case where an alleged retaliatory discharge is involved, an employee must establish: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two. *Id.*

 Applying this standard to the alleged retaliation by UPI in discharging Hubbard, we find that Hubbard established a prima facie case. Hubbard has shown that he engaged in statutorily-protected activity pursuant to Minn.Stat. § 363.03, subd. 7 (1980), by filing a charge with the Minnesota Department of Human Rights in April 1980 alleging employment discrimination by UPI, and by filing the complaint herein in June 1980. It is further undisputed that Hubbard was discharged in June 1980, and the record therefore also demonstrates adverse employment action. The difficulty in finding that Hubbard has es-

tablished a prima facie case of retaliatory discharge concerns the degree to which the record shows a causal connection between the protected activity and the adverse employment action. It is recognized, however, that this causal connection may be demonstrated indirectly by evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time. *See Burrus v. United Telephone Company of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982). We find that the inference arising from UPI's discharge of Hubbard only 2 days after service of the complaint in this action is sufficient to show retaliatory motive for purposes of Hubbard's prima facie case.

 Once the prima facie case is established, the burden of production shifts to the employer to show some legitimate, nondiscriminatory reason for the discharge. We find that UPI satisfied its burden with evidence demonstrating that its basic decision to get rid of Hubbard, by either securing his resignation or discharging him, was made months before Hubbard ever engaged in any protected activity, and that the decision was motivated by a judgment that Hubbard was not performing his job satisfactorily. For example, on August 10, 1979, after the conflict over the Nicaragua incident and at a time in which the employment relationship had grown increasingly strained, Bill Lyon wrote, in response to inquiry from another management official about what to do with Hubbard, that: "I agree with you wholeheartedly that we are going to have to get rid of Jim Hubbard * * *." At the end of January 1980, JoAnne Bryne, a Minneapolis newsside staffer, wrote a set of notes complaining about Hubbard's performance. In these notes, which were unsolicited and which were eventually passed on to Lyon, Bryne describes Hubbard's poor performance and threatens to file a grievance against Hubbard if "something isn't done to get this guy going [immediately], preferably someplace else." This extraordinary urging of

one union member that another be fired came to Lyon's attention in March 1980, and Lyon saw the letter as more confirmation that Hubbard wasn't doing his job satisfactorily. Lyon consulted with UPI's counsel, Jack Novatney, and expressed his determination that the time had come to do something about Hubbard. At Novatney's suggestion, Lyon collected written evaluations for use in demonstrating just and sufficient cause for Hubbard's dismissal in an anticipated arbitration proceeding. He received written evaluations from Jack Graeme and Dick McFarland, both of whom were highly critical of Hubbard's job performance. With these written evaluations in hand along with Bryne's notes, Lyon wanted to dismiss Hubbard immediately, but Novatney counseled against such action because he was in contact with Hubbard's attorney and hoped to arrange a meeting of the principals. On March 18, after a meeting with Lyon, Novatney again called Hubbard's counsel and told him that Hubbard's discharge was "very close at hand." When Hubbard's counsel raised possible settlement, Novatney responded that UPI would consider it, but that the "most likely result was dismissal." Hubbard's attorney then mentioned that Hubbard would file a discrimination claim. This evidence indicates that Lyon's decision to seek Hubbard's dismissal for poor performance was substantiated and untainted by any retaliatory motivation. Upon this record, we find that UPI has met its burden of production in presenting sufficient evidence of a legitimate nondiscriminatory motivation to rebut Hubbard's allegations of reprisal.

Given that UPI dispelled the inference of retaliation by producing evidence of legitimate reasons for its actions, Hubbard could still prevail if he demonstrated that the articulated reasons were pretextual, or if he otherwise carried his overall burden of persuasion. In its findings in support of the conclusion that Hubbard proved his retaliation claim, the trial court placed considerable reliance on the timing of the discharge. Although the timing of the discharge in this action does raise an inference

of retaliatory motive that is sufficient to satisfy the causation element of Hubbard's prima facie case, we find that that inference has been soundly rebutted and that it does not operate to satisfy Hubbard's ultimate burden of persuasion. A retaliatory motivation has not otherwise been proven. This is not a case where the employer acted on impulse, in response to a charge or complaint. Rather, the record clearly shows that UPI had first determined to discharge Hubbard long before any protected activity, that the decision to terminate was made after careful consideration of legitimate reasons before any charge of discrimination was filed, and that the decision was then carried out despite Hubbard's having commenced this action, not because of it. Accordingly, we conclude that Hubbard failed to prove that UPI discharged him in retaliation for his participation in activities protected under the Minnesota Human Rights Act. We therefore reverse the district court's findings that Hubbard established a retaliation claim.

Reversed.