**Olga KOVALEVSKY, Plaintiff,**

v.

**WEST PUBLISHING
COMPANY, Defendant.**

No. 3–84–1671.

United States District Court,
D. Minnesota,
Third Division.

Nov. 2, 1987.

William Mavity, Mavity & Ryan, Minneapolis, Minn., for plaintiff.

Linda L. Holstein, Opperman & Paquin, Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER FOR JUDGMENT AND MEMORANDUM

RENNER, District Judge.

This case came on for trial before the undersigned Court, without a jury, on the 24th day of August, 1987, and continued through the 8th day of September, 1987. Representing the plaintiff was William Mavity, of the law firm of Mavity & Ryan, and representing the defendant was Linda Holstein, of the law firm of Opperman and Paquin.

Based upon the evidence, briefs and arguments of counsel, the Court hereby renders the following Findings of Fact, Conclusions of Law, Order for Judgment and Memorandum:

### FINDINGS OF FACT

1. Plaintiff Olga Kovalevsky is a 61 year old female of Ukrainian origin who emigrated to the United States from a displaced persons camp in Hanover, Germany in 1949. She is a citizen of the United States. She came to Minnesota in 1950.

2. Plaintiff is married to Michael Kovalevsky, a Ukrainian, whom she had met in the camp at Hanover. He joined her in the United States sometime after her arrival. In 1966, the couple adopted their son Mark, who, at that time, was nine months old. Mark is currently 21 years old.

3. Plaintiff has had difficulty learning English and is not fluent in the language. She never studied, or took lessons in English. She has trouble understanding it. She and her husband continue to speak Ukrainian at home, and much of the couple's social life is centered on the local Ukrainian church, where Ukrainian is the spoken language. Consequently, plaintiff speaks only limited, broken, accented English.

4. With the exception of a two year period following Mark's adoption, during which time plaintiff remained at home to care for him, the Kovalevskys have each worked full-time since their arrival in this country. Michael Kovalevsky worked for nine years washing railroad cars and, since 1959, was employed by Sperry Corporation in St. Paul (formerly Univac Corporation). He is now retired.

5. Since her arrival in the United States, plaintiff has held a variety of jobs. She worked in a factory that manufactured toothpaste tubes and at American Linen Supply she operated a linen-pressing machine. Plaintiff was also a housekeeper in the hospitals of the University of Minnesota. She was employed as a miscellaneous helper in the bindery department of defendant West Publishing Company from January 2, 1968 until her discharge on April 18, 1983.

6. Defendant West Publishing Company manufactures, publishes and markets legal information systems and books. Defendant employs in excess of 15 employees and is an employer within the meaning of 42 U.S.C. § 2000e(b) and Minn.Stat. § 363.01, subd. 15.

7. As a miscellaneous helper, plaintiff assisted in the various operations needed to bind and ship books and related products, such as stacking books, inspecting for and repairing defects, feeding signatures into sewing and gathering machines, and related work. The position requires the individual to perform as part of a crew in such a way as to maintain a specified production, quality and yield rate for each job.

8. Periodic appraisals of plaintiff's work performance were made by her supervisors from 1972 to 1983, with the following results:

| | |
|---|---|
| 1972: | Marginal |
| 1974: | Satisfactory |
| 1975: | Satisfactory |
| 1976: | Satisfactory |
| 1977: | Marginal |
| 1978: | Average |
| 1979: | Substandard |
| 1980: | Satisfactory |
| 1981: | Satisfactory |
| Feb. 1983 | Satisfactory |

9. During the first 13½ years of her employment by the defendant, from 1968 to the middle of June 1981, plaintiff worked the second shift, 3 p.m. to 11 p.m. During this period, as indicated on her performance appraisals for those years, her supervisors found her work to be generally satisfactory and her attendance good to excellent. By her own characterization, these were "good years" for her at West Publishing. She had many friends among her co-workers and was socially at ease.

10. In June of 1981, plaintiff asked the bindery department manager, Len Schire, for a transfer to the day shift in order to spend more time with her son. At that time, plaintiff began to suspect that their son was using marijuana, a concern that plaintiff subsequently related to at least one co-worker, to her treating doctors, and to personnel at Abbott Northwestern Hospital. When asked by Shire why she wanted to transfer to the day shift, plaintiff told him she wanted to be home in the evening because she was worried about her son using drugs, smoking and staying out late. Plaintiff told several friends that she was having trouble at home with her son and her husband. She feared that her husband had a lady friend. Plaintiff was transferred to the day shift that same June of 1981. There she worked under the supervision of Donald Jirik.

11. Plaintiff worked at defendant's "Main Plant" from 1968 to 1976, at defendant's "Highbridge Plant" from 1976 to early 1982, and at defendant's "Eagan Plant" from early 1982 until her discharge. John Wooldrik and Len Schire shared responsibility for management of the bindery department during its move to the Eagan plant in early 1982. Schire subsequently became the manager of the entire Eagan plant.

12. After her transfer from the night shift to the day shift in June 1981, plaintiff felt that her co-workers were teasing her. Plaintiff did not directly see or hear much of the teasing, but asserts that other co-workers told her it was occurring. She felt that her co-workers were engaging generally in talking, laughing and pointing at her. On a number of occasions, she did not directly hear the purported gossiping, but rather sensed that they were talking derogatorily about her. During this period, plaintiff also sensed that people at the Ukrainian church she attended were engaged in talking about, and laughing at, her.

13. Plaintiff specifically complains about being called a "Russian pig", "cow", and other derogatory names, being told by an unidentified co-worker that plaintiff's feet "stunk", being teased about "passing gas", and being teased by Rosemary Yeager, another co-worker, about the smells plaintiff left behind upon exiting the bathroom. Plaintiff asserts that Yeager gossiped to others about these incidents. Plaintiff also asserts she was wrongfully accused by co-workers of having stolen a company mop from the workplace, although no one claimed that the mop was taken from the premises.

14. The bindery was very noisy—on occasion reaching 89 decibels. Plaintiff worked on a line separated from the other lines, including the one from which, she alleges, the offending remarks were emanating. In between the lines were storage bins which, when filled, would partially obstruct plaintiff's view of those purportedly teasing her. These lines were full 95% of the time.

15. In general, plaintiff would appear to have been extremely sensitive to teasing incidents that occurred. She has offered less than convincing evidence that she was teased because of her Ukrainian origin, and no evidence that she was teased because of medical troubles or her psychiatric treatment.

16. Plaintiff has difficulty remembering if she reported teasing incidents to supervisory personnel, to whom she reported them or when she may have reported them. She does recall specific complaints which she made to West Personnel Manager William Newpower, Bindery Manager John Wooldrik, Assistant Personnel Manager Lamyra Olson, Plant Manager Len Schire, and a supervisor she identified as "Cliff Roberts." She has no recollection of discussing any incidents with her direct supervisor, Don Jirik. She never complained to anyone at West about harassment or teasing after October 11, 1982.

17. On or about August 19, 1982, plaintiff complained to Plant Manager Schire about Rosemary Yeager whom plaintiff believed was making fun of her bathroom habits and telling other co-workers that plaintiff smelled. Within two days of that complaint, plaintiff was moved to a different machine approximately 158 feet away from Yeager. Plaintiff states that she was never bothered again by Yeager.

18. In March of 1982 and again in September 1982, plaintiff, while working, experienced two episodes of near collapse, feeling weak and dizzy. Both times, she was taken by ambulance to Divine Redeemer Hospital and released within one hour. Before each collapse plaintiff had excruciating headaches, so bad she couldn't talk. Plaintiff apparently had suffered similarly severe headaches going back to 1980.

19. Following the episode in September, plaintiff's physician, Dr. Filipovich, was unable to find an organic cause for plaintiff's troubles and, feeling that she needed considerable psychological evaluation, referred her to Dr. William Brauer, a psychiatrist.

20. Plaintiff consulted attorney Warren Eustis sometime during August or September 1982, regarding the teasing at work. Eustis contacted Lamyra Olson, an assistant personnel manager at West, to discuss plaintiff's complaints. Olson discussed plaintiff's complaints with Wooldrik, then bindery department manager. Wooldrik conducted an investigation of plaintiff's complaints.

21. Plaintiff's attorney wrote to Lamyra Olson on September 30, 1982, setting forth plaintiff's problems as she had relayed them to him.

22. Between September 30th and October 11th, Olson and Wooldrik met with plaintiff. She was told to inform them immediately of any further incidents.

23. On October 11th, Olson contacted attorney Eustis to advise him of their efforts, and to inquire whether he would like additional action taken.

24. Eustis wrote to Olson on October 20, 1982, stating that he "deeply appreciated ... the very detailed efforts you made ... it is gratifying to see such prompt and specific action on the part of a larger corporation."

25. On October 15th, plaintiff told Dr. Brauer that she felt much improved about the atmosphere at work, and that her attorney had assured her of her job security. Plaintiff did not thereafter discuss any complaints about her co-workers with any of her supervisors.

26. During 1981 and 1982 plaintiff cried a lot and was depressed. She was going through menopause. She became forgetful. Her friend, Wanda Bahmet, testified that Olga acquired a different personality.

27. Dr. Mark Rindflesh, plaintiff's psychiatric expert, testified that her condition was work related. He, however, admitted that depression, anxiety disorder and somatization were all possible conditions from which plaintiff could be suffering.

28. On the advise of Dr. Brauer, plaintiff entered Abbott Northwestern Hospital on October 29, 1982 to participate in a 10-day intensive therapy program. During this program, plaintiff was encouraged to talk freely during one-on-one and group therapy sessions. She placed little emphasis on problems at work during the 10-day program. The Abbott Northwestern staff assessments of plaintiff indicate that plaintiff did not appear disabled and that she could return to work.

29. Upon her discharge from the hospital, plaintiff's psychiatrist advised her to return to work, finding no medical reason

why she should not. Plaintiff's husband, however, felt that she should not return to work. Plaintiff did not return to work during November and December of 1982.

30. On September 8, 1982 Olga Kovalevsky told Dr. Barbara Brauer that for two years she had felt sad, had terrible headaches, was going through menopause, and, that her husband didn't understand her. She also submitted a typewritten list of complaints in which she admitted to dizzy spells and felt totally unlike herself. In this list she also complained of co-worker ridicule. Her husband, at this time, told Dr. Barbara Brauer that his wife's symptoms started five years earlier and that she was unhappy, couldn't get to sleep and had an ulcer.

31. Jirik called her weekly during November and December, 1982 to inquire about her condition. Plaintiff told Jirik that she was not feeling well and was under doctor's care. He advised her to get well and return to work as soon as possible. Plaintiff did not herself contact any supervisor of defendant during this period.

32. When plaintiff returned to work February 2, 1983, the defendant was supplied with a written report from Dr. Brauer, dated January 27, 1983, in which plaintiff's condition was diagnosed as "depression" and her prognosis as "good," restriction as "non," degree of disability as "none apparent". The possible date of return to work was "Jan. 31st, 1983."

33. Defendant has unwritten policies which require absent employees to contact their supervisors on the first day of absence and regularly thereafter. Absent employees are required to obtain written medical explanations for absences beyond five days, and, if necessary, prognoses as to future recovery. Other West employees have been terminated due to failure to adhere to them. Plaintiff was aware of, and understood, these policies.

34. Plaintiff worked 13 days in February, 1983. On February 21st her medical condition again forced her absence. She saw Dr. Brauer on February 23rd and again on March 4th.

35. When she saw Dr. Brauer on February 23, 1983, plaintiff described numerous symptoms: her ulcer was acting up again; she was tired; she had headaches; and when hearing words at work she had trouble making sense of them. Plaintiff said that she feared "something terrible physically" may happen to her. She was forgetful and would do such things as put her eyeglasses in the refrigerator. Her husband told the doctor that plaintiff was still confused.

36. On March 4, 1983, when Olga Kovalevsky next saw Dr. Brauer, she again told him of her continued headaches and dizziness. She said she still was crying a lot and could not do her housework. She was having difficulty maintaining her balance.

37. Brauer instructed plaintiff not to return to work for two months. No one from West was contacted concerning Dr. Brauer's instruction and the company remained uninformed as to it.

38. Nurse Greeder's log for March 9, 1983 notes "Don Jirik states he has talked with her husband and her husband states she is again being treated for depression by Dr. Brauer." Jirik testified that he never talked to either plaintiff or her husband after February 23, 1983. Greeder testified that while the log is correct it refers to an earlier conversation about earlier absences—not those in February and March. The Court accepts Jirik's testimony as true.

39. Having previously been unsuccessful at getting medical information and prognoses from plaintiff, Wooldrik directed Nurse Anita Greeder to obtain the necessary information directly from Dr. Brauer. Greeder tried to obtain the information from Brauer during March 1983, but he failed to respond to her phone calls and letter. Plaintiff missed work the entire month of March, 1983, one of the busiest times of the year in the bindery department.

40. On April 6, 1983, Wooldrik wrote plaintiff informing her that the defendant had been attempting to get information from Brauer regarding her medical condition and expected return-to-work date but

that Brauer had failed to respond. Wooldrik concluded his letter as follows:

Unless we receive a medical reason why you are not at work from your doctor and a date you plan to come to work by April 18, 1983 we will have no alternative but to terminate your employment.

41. Neither plaintiff nor her husband contacted defendant after receiving the April 6th letter.

42. On April 12th, during a previously scheduled appointment, plaintiff gave Dr. Brauer the letter from Wooldrik. Brauer did not respond to defendant until late April.

43. Plaintiff saw Dr. Brauer on April 12th for the purpose of evaluating her then-current condition.

44. Having received no response from plaintiff, her husband or her physician, plaintiff was terminated by defendant on April 18, 1983. She was informed of the termination by letter from Wooldrik.

45. Defendant received a letter from Dr. Brauer on April 28, 1983, in which Brauer stated that plaintiff was interested in returning to work, but that in his opinion it appeared doubtful that she would be able to perform her work because of medical reasons. His advice to plaintiff was that she terminate her job.

46. Upon receipt of Dr. Brauer's letter, Wooldrik and William Newpower, Director of Personnel at West, discussed the possibility of reinstating plaintiff. Based on Dr. Brauer's medical opinion, they decided not to.

47. Dr. Brauer testified that, in his opinion, plaintiff's condition was not due to work at West Publishing Company but was bio-chemical in nature.

48. Dr. Dennis Philander, also a board certified psychiatrist, testified that plaintiff suffers from somatization disorder, as well as conversion disorder. Philander concluded that her condition was not due to physical origins.

49. Dr. Terry Zuehlke, clinical psychologist, determined that plaintiff is not psychotic, but suffers from conversion disorder and somatization. Zuehlke described plaintiff as being unimaginative, emotionally unstable, and having potential for misunderstanding social contacts. Zuehlke further observed that other peoples' opinion were very important to plaintiff; that she needs to attract attention; and that she has a strong tendency to somatic problems. Finally, Zuehlke concluded that, because of her personality, plaintiff believed she was being teased and ridiculed.

50. Plaintiff was next employed, beginning December, 1984, by the Canteen Corporation in St. Paul as a cafeteria worker. On May 14, 1985, while working, plaintiff had another collapse, similar to the two she had while working for defendant.

51. On October 7, 1983, plaintiff filed a charge with the Minnesota Department of Human Rights alleging discrimination on the basis of her age, sex, national origin and/or disability. On February 1, 1984, she filed a similar charge with the Equal Employment Opportunity Commission ("EEOC"). The Minnesota Department of Human Rights dismissed plaintiff's charge on September 17, 1984, finding no probable cause to believe that defendant had engaged in any unfair discriminatory practices. On October 30, 1984, plaintiff filed the instant suit. On January 9, 1985, the EEOC terminated processing of plaintiff's claim and sent her notice of her right to sue.

## CONCLUSIONS OF LAW

1. Plaintiff is a member of a class protected on the basis of national origin under Title VII of the Civil Rights Act of 1964, and under the Minnesota Human Rights Act.

2. The teasing to which plaintiff was subjected by her co-workers was not related to her national origin or medical condition.

3. Defendant took prompt and specific action to remedy plaintiff's complaints about her co-workers.

4. Defendant has articulated a legitimate, non-discriminatory reason for termination of plaintiff's employment.

5. Defendant's articulated reason for the termination of plaintiff's employment is not pretextual.

6. Plaintiff has not been discriminated against in the terms and conditions of employment based upon her national origin or disability.

7. Plaintiff has not been discriminatorily discharged from employment based upon her national origin or disability.

Based upon the foregoing Findings of Fact, Conclusions of Law, the Court makes the following:

## ORDER FOR JUDGMENT

Plaintiff's complaint is in all respects dismissed, plaintiff has and recovers nothing of defendant, and the action is dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## MEMORANDUM

Plaintiff Olga Kovalevsky asserts two distinct claims against West Publishing Company, her former employer. First, she says she was discriminated against by reason of her Ukrainian national origin. Second, she maintains the discrimination was also by reason of her medical condition.

The Court has made extensive findings of fact, negating the need to greatly expand upon them. The parties have, by stipulation, agreed that the relevant time in issue was from June, 1981 when plaintiff was transferred to the first shift at the bindery, until April 18, 1983, the date of her termination.

There are two statutes at issue: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Minnesota Human Rights Act Minn.Stat. § 363.03, subd. 1. "Because of the substantial similarity in the language and purpose of the two statutes," Minnesota courts look to the Title VII rulings of the federal courts in resolving claims arising under the state

act. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 441 (Minn.1983). Under both the federal and state statutes plaintiff must prove that the defendant intentionally discriminated against her. *United States Postal Service v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Hubbard,* 330 N.W.2d at 441.

A three part analysis governs this Court's consideration of plaintiff's intentional discrimination claims. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff must establish a prima facie case. To do so, plaintiff must show that 1) she was a member of a protected class; 2) that she was qualified for the job; 3) that she was discharged; and 4) that the employer subsequently sought or assigned a nonmember of the protected class to do the same work. *Id.* at 802, 93 S.Ct. at 1824.

■ Plaintiff's Ukrainian roots are clearly sufficient to establish her as a member of a protected class for purposes of her national origin discrimination claim. The term "national origin" is broadly construed in this context to include "the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1 (1985).

With respect to her disability claim, it is true that plaintiff was an ill woman in 1981, 1982. She had physical, emotional and psychological problems of a significant nature. For purposes of argument, the Court will assume that these problems were serious enough to constitute a "disability" within the meaning of Minn.Stat. § 363.01, subd. 25.[1]

There is no dispute as to the second and third elements of the prima facie case. Clearly, plaintiff was qualified for the position and was discharged.

Whether the fourth element of the prima facie case relative to replacement need actually be established is a matter of some controversy. *Compare Smith v. Monsan-*

---

**1.** At the time of plaintiff's discharge, "disability" was defined as "a physical or mental condition which constitutes a handicap." Minn.Stat. § 363.01, subd. 25 (1982). In light of the

Court's ultimate conclusions as to lack of discriminatory intent, the Court need not definitively determine whether plaintiff was "disabled." *Hubbard,* 330 N.W.2d at 443 n. 14.

*to Chemical Co.,* 770 F.2d 719, 722 n. 2 (8th Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986) *with Hubbard,* 330 N.W.2d at 442. Moreover, whether plaintiff met her burden is, at least with respect to the national origin claim, unclear. Defendant maintains that plaintiff's position was eventually filled by a Hispanic woman. There is no claim, however, that the replacement was disabled. In any event, for sake of argument, the Court will assume that this fourth element of the prima facie case has been established.

■ Where, as here, plaintiff has established a prima facie case, a presumption is created that the defendant unlawfully discriminated. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The second step of the three part analysis under *McDonnell Douglas Corporation* is to then shift the burden to defendant to articulate a legitimate nondiscriminatory reason for plaintiff's discharge. Clearly, this burden has been met. Defendant cites plaintiff's repeated failure to call in; repeated failure to respond to West's inquiries concerning her medical condition and return to work date; and failure to return a signed medical authorization form as requested.

Where, as here, defendant has carried its burden of production, the third and final step under *McDonnell Douglas Corporation* is to inquire whether plaintiff has proven by a preponderance of the evidence that defendant's preferred explanation for the discharge was pretextual. *Texas Department of Community Affairs,* 450 U.S. at 256, 101 S.Ct. at 1095. Here plaintiff fails as to both her national origin and disability claims.

■ As to her claim of discrimination by reason of her national origin, plaintiff asserts she takes great umbrage at being called a "Russian". In the light of history and the travails she has suffered, the Court can understand and appreciate her antagonism against such an appellation. This is different, however, than proof that the de-fendant was responsible for its existence or continuance.

As the Findings of Fact clearly indicate, West's conduct in attempting to dig out and remove any sign of discrimination by plaintiff's co-workers was exemplary. As to West's grounds for terminating plaintiff, there can be no doubt the policies relating to notification of illness and requiring a medical report as to its possible extent, even though not in writing, were well known to all workers, including plaintiff. There is no doubt that plaintiff was aware of the fact that workers had been fired for violating these policies in the past. Indeed, not only was plaintiff aware of the need to notify her employer and to give them her doctor's prognosis, she told her husband at different times during her absences to call West. Clearly, the defendant had the legal right to terminate plaintiff for her intransigent refusal to comply.

■ Finally, as to the claim of discrimination based upon plaintiff's disability, there is a complete paucity of evidence to support her contentions. Assuming arguendo, that plaintiff has established her prima facie case of disability discrimination, her claim nonetheless fails for the same reasons as her national origin claim. Defendant met its burden of production in establishing legitimate non-discriminatory reasons for the discharge; plaintiff has failed to carry the burden of persuasion that such reasons were pretextual. While she believes she was being discriminated against based on her condition at the time, such belief is at best only tenuous support for her claim.