David REESE, Plaintiff,

v.

**UNITED STATES GYPSUM COMPANY, Defendant.**

Civ. No. 4-87-263.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 8, 1989.

Robert S. Cragg and Cragg & Fobbe, Minneapolis, Minn., for plaintiff.

Kathleen M. Graham, Ellen G. Sampson and Leonard, Street and Deinard, Minneapolis, Minn., for defendant.

## ORDER

DOTY, District Judge.

This diversity case is before the Court upon defendant's motion for summary judgment made pursuant to Rule 56 of the Federal Rules of Civil Procedure. In addition, defendant seeks attorneys' fees and costs under Rule 11, Federal Rules of Civil Procedure, Minn.Stat. § 363.14, subd. 3, and 28 U.S.C. § 1927.

## FACTUAL BACKGROUND

The plaintiff in this case, David Reese, is a diabetic. The defendant, USG Acoustical Products ("USG"), is a company based in Chicago that manufactures acoustical products. On September 5, 1985, Reese began work for USG at a USG subsidiary plant in Red Wing, Minnesota. At that time, USG was aware of Reese's diabetes. Although the title of Reese's job as relief operator was eliminated in a 1986 plant reorganization, at the time that Reese held the job the relief operator was called on to relieve every job in the production department. According to both parties, Reese's diabetes had no adverse effect on his ability to perform his job. In fact, Reese held a second job working as a farm hand. Although the hours worked at this second job varied, during the month of September 1986 alone, Reese logged 124 hours of work.

On Friday, October 10, 1986, a USG employee told his supervisor that Reese had been sleeping while on the job. USG rules provide that an employee may be discharged for "willful misconduct" which includes "sleeping or loafing while on working time." (Reese Depo. Ex. 7). On the

following Monday, October 13, 1986, USG suspended Reese while it investigated the claim. USG interviewed several employees during its investigation. These witnesses could state only that Reese appeared to be sleeping. (Affidavit of William A. Schmitt at 2–3). Because the witnesses could not state that Reese had in fact been sleeping, the USG plant manager decided that the evidence supporting the October 10th incident was "inconclusive." *Id.* at 4. During the investigation, however, a separate allegation of Reese's sleeping on the job came to light. USG investigated this second allegation as well.

According to USG's investigation, on September 19, 1986, Reese worked the 11:00 p.m. to 7:00 a.m. shift. A fellow employee, Debbie Petrich, stated that Reese seemed tired and appeared to doze off while on break. (Petrich Depo. at 15–16). After the break was over, Reese went up into the computer room to wait for a different crew to finish the clean-up work preceding his own work. Once the clean-up work was finished, the supervisor of the clean-up crew, George McKinley, went to track down Reese. McKinley saw Reese sleeping in a chair in the computer room. (McKinley Depo. at 19–21). Reese's eyes were closed. *Id.* Petrich went into the computer room on two occasions to get a drink of water and saw Reese with his head down and his eyes closed. (Petrich Depo. at 18). After approximately 45 minutes the clean-up crew supervisor notified Willie Christofferson, Reese's supervisor, of the incident. Christofferson went up to the computer room and saw Reese with his head forward and his eyes closed. He then yelled at Reese to "wake up." (Christofferson Depo. at 15–17). By all accounts, Reese got up from the chair, walked out of the computer room and went back to work. (McKinley Depo. at 31; Christofferson Depo. at 27).[1]

Reese denies that he was sleeping on the job the night of September 19, 1986. (Reese Depo. at 60). Reese claims that he may have been suffering the effects of a diabetic reaction.[2] After Reese was suspended on October 18, 1986, and at the request of his wife, he went to see his doctor, Dr. Sprangers. Dr. Sprangers gave Reese a note which stated that: "[t]his patient has insulin dependent diabetes mellitus with a history of insulin reactions (hypoglycemia) and when that happens he appears sleepy or groggy until given sugar or physically stimulated." (Reese Depo. Ex. 17).

In his deposition, Dr. Sprangers stated that while it is "possible", though "not typical", for a diabetic suffering from a "mild" insulin reaction to recover (i.e. "wake up") without injections of sugar or insulin (Sprangers Depo. at 34), in his opinion "because [Reese] had not been seen for problems in the period surrounding the time in question, [he doesn't] think [Reese] would have had a significant problem with diabetes which would cause him to go to sleep on the job in September of 1986." (Sprangers Depo. at 22).

Dr. Sprangers further stated that the facts surrounding Reese's sleeping on the job in September 1986, were inconsistent with an insulin reaction:

Q. Was it her idea that it must of been an insulin reaction? Did she come up with that idea?
A. Yeah.
Q. Now I take it you never told your wife that you had an insulin reaction in September or October, 1986, did you?
A. No.
Q. As far as you knew, you didn't have an insulin reaction in September or October, 1986, isn't that right?
A. Right.
(Reese Depo. at 74–75).

1. Petrich stated in her deposition that she had seen Reese sleeping on the job in the computer room on approximately a dozen previous occasions. (Petrich Depo. at 21). Both McKinley and Christofferson stated that they had witnessed Reese sleeping on the job on at least five other occasions. (McKinley Depo. at 24, 32; Christofferson Depo. at 26).

2. Reese stated the following in his deposition:
Q. How did you think USG discriminated against you?
A. Well, I wasn't sleeping and the only thing we could come up with had to be an insulin reaction. So that's why she (Mrs. Reese) called him (Reese's doctor, Dr. Sprangers).

Q. ... I'd like you to assume that David Reese, given his medical background as you know it, was sleeping in a chair for somewhere between 15 minutes and an hour, or was sitting in a chair with his head down and his eyes closed. And people were going in and out of a room where he was without arousing him.

And then after he was seated in the chair for 15 minutes to an hour with his head down and his eyes closed, someone yelled, "Dave, get up." And he got up and went back to work without taking any sugar or any food. Would that, in your opinion, be consistent with a hypoglycemic reaction?

A. No.

Q. ... Why wouldn't it be consistent with a hypoglycemic reaction?

A. If a person's blood sugar is low, which is what hypoglycemia is, hypothetically they wouldn't respond till given sugar to bring the blood sugar back up again. The brain is explicitly dependent on blood glucose. And your brain simply doesn't function when there is not enough blood sugar.

Q. Would those facts, as I pose them to you, be inconsistent with a hypoglycemic reaction?

A. As you posed it, yes, they would be.

Q. ... Would it be fair to say that unless and until someone took sugar, the hypoglycemic reaction would not be neutralized or corrected?

A. Would not be corrected, that's correct.

(Sprangers Depo. at 19–20).

Also, Reese stated in his deposition that his diabetes did not cause him any problems in September or October 1986, and that as far as he knew, he did not have an insulin reaction during that time. (Reese Depo. at 74–75).

After completion of the investigation, the USG plant manager decided to discharge Reese for sleeping on the job. (Affidavit of William A. Schmitt at 5). Reese then brought this action for unfair discrimination under the Minnesota Human Rights Act, and USG's motion for summary judgment followed.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to the interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." After a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to produce some evidence manifesting the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, under Rule 56(e) the nonmoving party must go beyond the pleadings and, through the use of affidavits, depositions, answers to interrogatories and admissions provide "specific facts showing that there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. Also, to overcome a summary judgment motion, the nonmoving party must produce enough evidence that a reasonable jury could return a verdict for the nonmoving party. *Id.* Finally, summary judgment will be granted when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Reese's Complaint alleges that USG discriminated against him, because of his diabetes, in violation of the Minnesota Human Rights Act, Minn.Stat. § 363.01 *et seq.* (1986). No other cause of action has been alleged; thus the present motion, if granted, would dispose of this case.

The Minnesota Supreme Court, which this Court must follow in this diversity case, has adopted a three-part test that a trial court must apply to a discrimination case brought under the Minnesota Human Rights Act:

First, the plaintiff must present a *prima facie* case of discrimination by a pre-

ponderance of the evidence. If the plaintiff is successful in establishing a *prima facie* case, a presumption is created that the employer unlawfully discriminated against the employee. The burden of production then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment action. The sufficiency of the defendant's evidence is evaluated by determining whether it meets the plaintiff's *prima facie* case by presenting a lawful reason for the adverse action, and whether it frames the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. As indicated, if the employer succeeds in carrying its burden of production the plaintiff has an opportunity to show that the reason for the adverse action stated by the employer is not the real reason, but instead is a "cover" for discrimination. At this third and final stage the plaintiff has the ultimate burden of persuading the court, by a preponderance of the evidence, that the defendant intentionally discriminated against him. The plaintiff may sustain this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence".

*Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 443–44 n. 12 (Minn.1983) (citing and quoting in part from *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *accord Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 623 (Minn.1988); *Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–720 (Minn. 1986). To meet the initial burden of establishing a *prima facie* case in a disparate treatment case such as this one, Reese must show:

(1) He is a member of a protected class;

(2) He is qualified for the job from which he was discharged;

(3) He was discharged; and

(4) The employer assigned a nonmember of the protected class to do the same work.

*Hubbard,* 330 N.W.2d at 442.

In *Hubbard,* the Minnesota Supreme Court held, as a matter of law, that the plaintiff had failed to satisfy the third part of the three-part test. *Id.* at 437, 441–444. The Court assumed, for the purposes of its analysis, that Hubbard met the first part of the test, and it then found that the defendant employer had met its burden of production in establishing a legitimate, nondiscriminatory reason for discharge, and that Hubbard had not rebutted this finding either by procuring sufficient evidence for a finder of fact to find that the reason provided by the employer was a pretext, or by providing enough evidence that could persuade a fact finder that the employer had intentionally discriminated against Hubbard. *See Id.* at 443 n. 14.

(in so ruling, we are only holding that *Hubbard* failed to meet the burden of proof imposed upon him by the final step of the three-step ... analysis. We need not decide whether *Hubbard* satisfied the first step by establishing a *prima facie* case. Accordingly, we do not decide whether, or to what extent, alcoholism [the alleged discriminatory classification in *Hubbard* ] is a disability within the meaning of [the Minnesota Human Rights Act] ).

This same mode of analysis applies to the facts in the instant case. Even assuming, without deciding, that Reese could meet his initial burden of establishing a *prima facie* case, USG has met its burden of production of showing a legitimate business reason for discharging Reese (i.e. Reese's sleeping on the job in violation of known company policy), and Reese has failed to present the Court with sufficient evidence, by affidavit or otherwise, from which a reasonable factfinder could find either that USG's proffered business reason was a pretext, or that USG intentionally discriminated against Reese on the basis of his diabetes. Accordingly, defendant's motion for summary judgment must be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to [find] for that party").

In *Hubbard*, plaintiff alleged that his employer, United Press International (UPI), had discharged him due to his being an alcoholic in violation of the Minnesota Human Rights Act. *Hubbard*, 330 N.W.2d at 440. UPI asserted in response that it fired Hubbard for poor job performance, not alcoholism. *See Id.* at 443. Evidence that the Minnesota Supreme Court considered which supported this contention included:

> testimony from UPI staff members (one of whom was a member of Hubbard's union, and two others who were themselves alcoholics) regarding seriously critical evaluations they made to Hubbard's supervisors regarding his job performance and testimony of three former subscribers to UPI's newspictures service, each of whom testified regarding their dissatisfaction with the picture report they received during the period in which Hubbard was responsible for providing them service.

*Id.* The Supreme Court also noted that:

> [n]one of UPI's letters of inquiry and criticism, either to Hubbard or internally, criticize Hubbard for drinking or for being an alcoholic and seeking treatment. They criticize only job performance, and specifically concern a perception by management regarding Hubbard's poor news judgment, his failure to coordinate with newsside, and his persistent lack of aggressiveness in servicing clients by providing responsive state coverage.

*Id.* Based upon this evidence, the Supreme Court concluded, as a matter of law, that UPI had legitimate nondiscriminatory reasons for its actions. *Id.*

The evidence provided the Court in the instant case through affidavits, depositions and exhibits similarly supports a finding that, as a matter of law, USG had a legitimate, nondiscriminatory reason for discharging Reese. It is undisputed that USG had a published company policy that sleeping while on the job was grounds for termination, and that Reese knew of this policy before September 19, 1986, the date USG's investigation determined that Reese was sleeping for over half an hour while on the job. Three employees of USG stated in their depositions that they saw Reese sleeping on September 19, 1986, and USG's manager who was responsible for the decision to discharge Reese, stated in his affidavit that Reese's sleeping while on the job was the sole reason for his decision to terminate Reese. (Affidavit of William A. Schmitt at 5). Furthermore, as in *Hubbard*, with respect to alcoholism, none of USG's communications to Reese criticize him for having an insulin reaction or being a diabetic. Accordingly, the Court finds that USG had a legitimate, nondiscriminatory reason for its decision to discharge Reese.

In *Hubbard*, in an effort to show pretext, plaintiff provided evidence of numerous awards and prestigious coverage he had received as a reporter. *Hubbard*, 330 N.W.2d at 443. He also argued that the fact that UPI did not pursue termination of him through a contract which permitted it to terminate Hubbard for "just and sufficient cause" demonstrated that UPI did not terminate him for poor performance, which UPI could have attempted to show to an arbitrator using the contract, but instead terminated him for alcoholism. The Minnesota Supreme Court rejected, as a matter of law, these efforts to show pretext. *Id.* at 437, 443.

Similarly, in the instant case, Reese has failed to present sufficient evidence to the Court upon which a reasonable factfinder could find that USG had terminated him for diabetes, not sleeping. Reese points to two pieces of evidence to support his contention that USG terminated him for diabetes. First, Reese points to his own deposition where he stated that he was not sleeping on September 19, 1986, and second, Reese points to his doctor's deposition where his doctor stated that while it is not typical, it is "possible" for a diabetic suffering from a "mild" insulin reaction (which causes diabetics to be tired or listless) to recover without injection of insulin or sugar.

While Reese's conflicting statement and his doctor's deposition may raise a question of whether he was in fact sleeping on September 19, 1986, (although based upon the overwhelming evidence to the contrary, such a finding seems well beyond the purview of a reasonable factfinder), Reese has failed to provide the Court with any evidence which would tend to show that USG's manager, William Schmitt, in making the decision to discharge Reese, was using a finding of sleeping as a pretext to fire Reese because he was a diabetic. Schmitt conducted an extensive investigation whereby he interviewed three employees who corroborated each other's accounts of Reese's sleeping on the job on September 19, 1986. Based upon this investigation, Schmitt decided to terminate Reese. (*See* affidavit of William Schmitt at 5). The mere fact that Schmitt may have made the wrong decision (assuming Reese's contrary deposition statements were true), does not warrant the inference that he made the finding that Reese was sleeping on the job as a pretext for discharging Reese because he was a diabetic. In the absence of further evidence that Schmitt's decision to terminate Reese was grounded on anything other than his determination that Reese was sleeping, the Court is constrained to hold as a matter of law that Reese has failed to show that USG's actions were a pretext, or for that matter, that USG in any way intentionally discriminated against Reese on the basis of diabetes. Reese, therefore, has failed, as did Hubbard, to meet the third step of the three-step *Hubbard* test. Accordingly, defendant's motion for summary judgment is granted.

The Court, however, denies defendant's motion for costs and attorneys' fees, because it finds that plaintiff's Complaint was not "frivolous, unreasonable, or without foundation". *See Sigurdson v. Isanti County*, 386 N.W.2d 715, 722 (Minn.1986) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)).

In sum, IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment is granted.

2. Defendant's motion for costs and attorneys' fees is denied.

LET JUDGMENT BE ENTERED ACCORDINGLY.