Susan LUDWIG, Plaintiff,

v.

NORTHWEST AIRLINES, INC., Defendant.

No. Civ. 98–1580PAM/FLN.

United States District Court, D. Minnesota.

April 5, 2000.

Stephen W. Cooper, Kathryn J. Cima, Stacey R. Everson, Eric D. Bull, Cooper Law Office, Minneapolis, MN, for Susan Ludwig, Plaintiff.

Timothy Robert Thornton, Lauren Elizabeth Lonergan, Kristin L. Chong, Briggs & Morgan, Minneapolis, MN, for Northwest Airlines, Inc., Defendant.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon Defendant Northwest Airlines, Inc.'s Motion for Summary Judgment. For the following reasons, the Court grants Defendant's motion.

## BACKGROUND

Plaintiff Susan Ludwig ("Ludwig") has been a Northwest Airlines, Inc. ("North-

west") flight attendant since 1974. During her long tenure with Northwest she has had received numerous commendations for her work.[1] She has also been cited several times for attendance, performance, and behavioral difficulties. For example, between 1991 and 1995 Ludwig received five doctor's note advisories[2] and was either sick or on leave for most of 1995. (*See* Def.'s Mem. at 6; Def.'s Exs. 10–16; Emeott Aff.Ex. E.) She has also been involved in several incidents, which according to Northwest, evince problematic behavior. The first such incident was a security breach in Sacramento in which Ludwig disregarded FAA regulation by entering a secure area unescorted. (*See* Emeott Aff. Ex. A.) When told to leave the area, Ludwig allegedly behaved indignantly and defiantly, and was thereafter described by the manager on duty as a "very difficult person to deal with." (*See id.*) The second incident was also a classified as a security breach. According to the report, Ludwig called Crew Scheduling during a security alert to complain about staffing, but refused to identify herself, as required. (*See* Emeott Aff.Ex. B.) Once again, Ludwig was reportedly hostile, unprofessional, and defiant during the encounter. (*See id.*) Third, Ludwig failed to account for $47 of in-flight liquor sales, and thereafter failed to complete the required forms explaining the discrepancy in a timely manner. (*See* Emeott Aff.Ex. F.)

The fourth incident occurred in the 1980's during a flight simulator test. (*See*

Pl.'s Ex. CC.) According to instructor Stephen Wilkinson, after Ludwig "decisively" failed the test, she proceeded to become "extremely abusive" toward him, as well as the presiding Federal Aviation Administration ("FAA") inspector. (*Id.*) Wilkinson ultimately described her as "so belligerent, so unable to face criticism, so narrowly focused as to be unable to realize dangerous situations." (*Id.*)

In 1994, Ludwig applied for a pilot position through Northwest's internal hiring process. The three-step process first required applicants to meet minimum objective criteria, which included having a commercial pilot's license, a flight engineer rating or a passing score on a flight engineer's written exam, and 1000 total flight hours. (*See* Pl.'s Ex.G.) If the applicant met these criteria, he or she proceeded to Phase I of the process, which consisted of a standardized battery of tests administered to measure general cognitive ability, intelligence, psychological characteristics, Crew Resource Management ("CRM") skills,[3] and interpersonal skill performance. (*See* Foushee Dep. at 9.) To measure these skills, Northwest administered the Multidimensional Aptitude Battery ("MAB") and the Personal Characteristics Inventory ("PCI"), both objective tests. (*See id.*) If the applicant passed through Phase I, he or she moved on to Phase II, which included a panel interview and a flight simulator test.

Although Ludwig met the minimum objective criteria and passed through Phase I

---

1. Ludwig states that she has received a "stack" of commendations. (*See* Pl.'s Mem. at 3.) Although she has received numerous commendations, the "stack" provided to the Court consisted primarily of duplicates and documents not constituting commendations. In fact, there were only 12 documents that could possibly qualify as commendations in the 44 documents provided by Ludwig. (*See* Pl.'s Ex. W.)

2. A flight attendant will receive a doctor's note advisory if his or her sick leave exceeds three sick incidents in a twelve month period. (*See* Chong Aff.Ex. 2 at 14.2.) The advisory alerts employees that a doctor's note will be

required the next time there is a sick incident. (*See id.*) This policy is designed to deter sick leave abuse. (*See* Def.'s Mem. at 6.)

3. CRM skills include: stress tolerance, leadership, group cohesiveness, teamwork, personality, communications skills, and assertiveness. The Federal Aviation Administration ("FAA") and the National Transportation Safety Board ("NTSB") have attributed a significant percentage of major carrier accidents to CRM failures. (*See* Def.'s Mem. at 2, n. 3.) Such skills are therefore considered to be of primary importance in any pilot candidate. (*See* Foushee Dep. at 41–44.)

of the process in 1994, she decisively failed the simulator test and was promptly eliminated from the application process. (*See* Emeott Dep. at 43.)

Ludwig reapplied for a pilot position in 1995. Once again, Northwest found that Ludwig met the minimum objective criteria, and she moved on to Phase I.[4] Ludwig also passed through the objective battery of tests administered in Phase I. After the Phase I tests had been scored, however, Northwest decided to supplement the application process with a background check. (*See* Emeott Dep. at 13, 23–25.) Northwest claims that its decision to supplement the Phase I process in this manner was prompted by the low "select-in" rate of both male and female applicants. (*Id.* at 25.) With the implementation of the background check, those individuals who had failed the Phase I tests remained pilot candidates. According to Northwest, the background check was a better indicator of CRM skills and commercial pilot readiness than the objective tests previously administered. (*See* Foushee Dep. at 42–44; Kern Dep. at 35–36.) Ludwig, though, argues that the background check was implemented because too many women, and not enough men passed the Phase I battery of tests. In support of this accusation, she cites the negative effect the background check ultimately had on female applicants. For example, although six of the nine remaining females passed the Phase I objective tests, only five of the nine passed the background check (*See* Pl.'s Mem. at 12.)

Ludwig was one of the females who passed through the objective testing in Phase I, but failed to meet the background check criteria. Northwest cites her high absenteeism, low CRM skills, troublesome attitude, and poor performance as reasons for her elimination. (*See* Def.'s Mem. at 6–8.) As noted by Robert Tice ("Tice"), senior labor counsel for Northwest, "[p]oor attendance as a flight attendant [is regarded as] an indicator of future performance in a piloting position. And poor performance with respect to getting along with fellow employees, respecting rules and the authority of governmental agencies, etcetera, [ ] is extremely important to predicting future performance as a pilot." (Tice Dep. at 57.) Ludwig contends that she was eliminated because she is female.

On September 3, 1996, Ludwig filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of sex for her elimination from the pilot hiring process in 1995 and retaliation for her complaints about the 1994 hiring process. Ludwig has never alleged that she was discriminated against during the 1994 hiring process. The EEOC issued a Right to Sue letter and Ludwig promptly sued Northwest alleging that she. was discriminated against on the basis of sex in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, and the Minnesota Human Rights Act, Minn.Stat. § 363.01 ("MHRA").

On July 11, 1997, Ludwig filed a second EEOC complaint, alleging that she was retaliated against for filing her discrimination claim. In particular, she alleged that she was unfairly denied a transfer and was generally held to a higher standard than similarly situated employees who have not filed such complaints. Once again, Ludwig was issued a Right to Sue letter by the EEOC. Thereafter, she filed a second suit alleging retaliation in violation of Title VII and the MHRA; negligent supervision, training, retention and hiring; and intentional infliction of emotional distress. The two cases were consolidated on January

---

**4.** In fact, Ludwig did not meet the minimum threshold criteria because she did not satisfy the continuous employment requirement. (*See* Emeott Dep. at 51–53.) In particular, she was not at work for most of 1995, and there was a continuous three month period where she was not at work at all. (*See id.*) Nevertheless, Northwest waived the continuous employment requirement for her and allowed her to proceed to Phase I of the hiring process. (*See id.*)

27, 1999. On September 3, 1999, Northwest filed the instant Motion for Summary Judgment.

## DISCUSSION

### A. Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quotation omitted).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *See Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957.

### B. Title VII and MHRA Claims

#### 1. *Disparate Treatment*

Title VII and MHRA disparate treatment claims are analyzed under the three-step framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Lee v. Minnesota,* 157 F.3d 1130, 1133 (8th Cir.1998) (citing *Feges v. Perkins Restaurants, Inc.,* 483 N.W.2d 701, 710 (Minn. 1992)). The first prong requires the plaintiff to establish a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff meets this obligation, the burden shifts to the defendant to proffer a nondiscriminatory explanation for its conduct. *See id.* If the defendant meets this burden, the prima facie presumption of discrimination disappears. The burden then reverts to the plaintiff to establish that the defendant's proffered legitimate reason was pretextual. *See id.* at 804, 93 S.Ct. 1817.

■ "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff must merely prove by a preponderance of the evidence that: 1) she was a member of a protected class; 2) she was qualified for the position; 3) she was not hired for that position; and 4) the employer filled the position with a person not in the protected class. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. It is undisputed that Ludwig meets the first, third, and fourth criteria, therefore, the only real issue is whether Ludwig was "qualified" to be a Northwest pilot. Ludwig argues that she was qualified for the position because she met the minimum objective criteria, such as having a commercial pilot's license, a flight engineer rating, and 1000 total flight hours. In order to become a commercial pilot for Northwest, however, applicants are also required to possess a certain measure of general cognitive ability, intelligence, psychological characteristics, CRM skills, and interpersonal skills. In addition, the applicant must also be able to pass a flight

simulator test. Northwest argues that Ludwig was not qualified to be a Northwest pilot because, in its opinion, she could not meet all of these criteria.

■ In order to be deemed "qualified" at this stage of the analysis, Ludwig need only establish that she met the minimum "objective qualifications for the job." *Legrand v. Trustees of Univ. of Arkansas at Pine Bluff,* 821 F.2d 478, 481 (8th Cir. 1987); *see also Hase v. Missouri Div. of Employment Security,* 972 F.2d 893, 896 (8th Cir.1992) (holding that in order to establish a prima facie case under the *McDonnell Douglas* framework, a plaintiff must demonstrate that he meets the "minimum qualifications for the position"); *Axtel v. Northwest,* No. 97–2632, slip op. at 8 (D.Minn. June 30, 1999) ("While recognizing NWA's interest in evaluating a candidate's CRM and technical skills though an interview process, the law of this circuit makes clear that only objective criteria can be used when evaluating whether a plaintiff has made out a prima facie case."). Subjective qualifications of the employee are analyzed later, under step two of the analysis. *See Legrand,* 821 F.2d at 481 (citing *Lynn v. Regents of the Univ. California,* 656 F.2d 1337, 1344–45 (9th Cir. 1981)).

Because it is clear that Ludwig met the minimum objective criteria for the position—that is, the posted qualifications—the Court concludes that Ludwig was in fact "qualified" for the position within the meaning of *McDonnell Douglas* and its progeny. Accordingly, the Court finds that Ludwig has established a prima facie case of discrimination.

■ In order to rebut the presumption of discrimination, Northwest must proffer a legitimate non-discriminatory reason for its hiring decision. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Northwest has done just that by citing high absenteeism, low CRM skills, troublesome attitude, and poor performance as its reasons for eliminating Ludwig from the ap-

plicant pool. Accordingly, the Court concludes that Northwest has met its burden under the second step of *McDonnell Douglas.*

Because Northwest has successfully rebutted the presumption of discrimination, "the factual inquiry proceeds to a new level of specificity." *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089. Ludwig bears the ultimate burden of persuading the Court that "she has been the victim of intentional discrimination." *Id.* at 256, 101 S.Ct. 1089. More specifically, in order to survive summary judgment Ludwig must proffer evidence of pretext—i.e., that her rejection was driven by discriminatory motives rather than legitimate business reasons. Ludwig may do this "directly, by persuading the court that a discriminatory reason more likely [than not] motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence." *Hase,* 972 F.2d at 896 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089).

■ Ludwig simply cannot meet this burden. She makes numerous conclusory statements that, if supported by the record, could possibly establish pretext. For example, "Defendant attempted to exclude Plaintiff at this early stage [Phase I], using a different application of the rules than was used for at least two male applicants." (Pl.'s Mem. at 5.) This averment, however, is not supported by the record. Ludwig has supplied the Court with voluminous documentation about the other applicants, most of which is either indecipherable or unsupportive of her position. Through this evidence, Ludwig has utterly failed to establish that the male candidates were "similarly situated in all relevant respects." *Lanear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir.1988). To the contrary, none of the male applicants had the same behavioral and performance difficulties as Ludwig. (*See* Pl.'s Ex. A.) In addition, Ludwig appears to have had the most consistent and recent attendance problems of any other applicant. (*See id.;* Pl.'s

Mem. at 9; Def.'s Exs. 10–16; Emeott Aff.Ex. E.) Thus, she has failed to establish that the male candidates were similarly situated in all relevant respects.

■ Ludwig further alleges that "Defendant, then solely because it did not like the fact that certain men had failed[,] substituted the test with a less reliable, more subjective criteria." (Pl.'s Mem. at 18.) And, "[i]t appears however, that Northwest did not like the high proportion of females excelling on the test." (*Id.* at 6.) Again, neither of these statements are anything more than bald accusations, wholly conclusory and unsupported by the record. In fact, Northwest's decision to implement the background check resulted in the hiring of a female applicant who would otherwise have been eliminated from the process on the basis of her PCI score. (*See* Emeott Supp.Aff. ¶ 4.)

Furthermore, Ludwig's conclusory allegations that she is eminently qualified to be a commercial airline pilot and that her employment file was scrutinized more vigorously than male applicants carries no weight in the Court's analysis. *See* Fed. R.Civ.P. 56(e) (stating that a party opposing summary judgment may not rest on mere allegations, but must set forth specific facts showing that there is a genuine issue for trial). What does matter, however, is "whether the employer gave an honest explanation of its behavior." *Krenik,* 47 F.3d at 960. The Court is persuaded that Northwest has done just that.

■ Moreover, given the substantial public safety implications attendant to the hiring of commercial airline pilots, the Court accords Northwest "considerable discretion" in making such decisions. *Axtel,* slip op. at 9. As aptly articulated by the Court of Appeals for the District of Columbia,

> [T]he airline industry is one in which safety is of the utmost importance. The staggering death tolls and resulting human suffering which have followed some of our nation's horrible air disasters at-

test to this fact. Therefore, in our judgment, the airline industry must be accorded great leeway and discretion in determining the manner in which it may be operated most safely[.]

*Murnane v. American Airlines, Inc.,* 667 F.2d 98, 101 (D.C.Cir.1981). Accordingly, Northwest retains a wide degree of discretion when making decisions in the hiring of pilots who will ultimately be responsible for the safety of thousands of air travelers.

In sum, Ludwig's failure to affirmatively establish evidence of pretext, coupled with the deference commercial airlines are afforded in hiring pilots, leads the Court to conclude that Northwest's stated reasons for its decision with respect to Ludwig are non-pretextual and worthy of credence. Accordingly, Northwest's Motion for Summary Judgment is granted as to Ludwig's Title VII and MHRA disparate treatment claim.

### 2. *Disparate Impact*

■ Disparate impact claims challenge employment practices that are "facially neutral but that fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36, n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). To establish a prima facie case of disparate impact, the plaintiff must demonstrate that a specific employment practice has a significant impact on a protected group. *See Houghton v. SIPCO, Inc.,* 38 F.3d 953, 958 (8th Cir.1994). This is typically done through the use of statistical evidence, which reveals that the practice in question has excluded applicants due to their membership in a protected group. *See Langlie v. Onan Corp.,* 192 F.3d 1137, 1140 (8th Cir.1999), *petition for cert. filed,* (U.S. Jan. 26, 2000) (No. 99–1387), (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). If the plaintiff

meets this burden, the defendant must demonstrate that there is a "business justification" for the challenged practice. *Houghton,* 38 F.3d at 958 (quoting *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 659, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)). The plaintiff may rebut the defendant's business necessity defense by proffering an equally effective, but less discriminatory alternative employment practice. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *see also Allen v. Entergy Corporation, Inc.,* 193 F.3d 1010, 1013 (8th Cir.1999). Throughout the analysis, the burden of persuasion remains with the plaintiff. *See Houghton,* 38 F.3d at 958.

 The Court assumes, without deciding, that Ludwig has made a prima facie case of disparate impact and turns directly to the question of whether Northwest's employment practice is justified by business necessity.[5] In order to meet this burden, Northwest must demonstrate that the hiring practice has a "manifest relationship to the employment in question ... and that it is necessary to safe and efficient job performance." *Smith v. City of Des Moines,* 99 F.3d 1466, 1471 (8th Cir. 1996) (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), *Dothard v. Rawlinson,* 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977)).

 The employment practice condemned by Ludwig appears to be Northwest's use of the background check during Phase I of the internal hiring process. Northwest argues that the background check has a manifest relationship to the pilot position because it measures CRM skills, which are essential qualities in a commercial pilot. (*See* Foushee Dep. at 41–44.) CRM skills, which include stress tolerance, leadership, group cohesiveness, teamwork, personality, communications skills, and assertiveness, are generally considered to be strong predictors of successful commercial piloting, and are precisely the kind of qualities that may be gleaned from employment files. When asked how the background check related to CRM skills, Dr. H. Clayton Foushee, Jr. responded that,

> [P]ast behavior is a very good predictor of future behavior. In the case of the internal applicants, we felt that it was extremely important and in fact far more predictive to look at their employment history, and to see if there was any evidence in any of their records that they had difficulties dealing with other employees, had been involved in significant disputes, so on and so forth. So the relationship between that behavior, and if I find in an employment jacket that an employee has had a number of complaints filed against them by passengers or they have had disputes with their supervisors or there is some sort of history of confrontational behavior, I would be very concerned about that individual's ability to blend in and work effectively as a member of a cockpit team. And I would find that highly predictive of so-called CRM behavior.

(*See* Foushee Dep. at 42–43.) Indeed, Northwest believed that the background check would do a better job of screening out poor pilot candidates than the objective tests. (*See id.* at 24.) Therefore, the Court concludes that the background check bears a manifest relationship to the pilot position.

For similar reasons, the Court finds that Northwest also meets the second prong of the test. As previously noted, CRM skills are considered to be accurate indicators of pilot success. In other words, a pilot with

---

5. Because the business justification for Northwest's implementation of the background check is so compelling, the Court does not fully addressing whether Ludwig has made a prima facie case of disparate impact. Given the small sample size and the cursory affidavit provided by Ludwig's expert in an effort to establish disparate impact, (*see* Lorenz Aff.) the Court seriously doubts whether she has in fact made such a showing.

low CRM skills is deemed more likely to be involved in, and cause accidents than pilots with high CRM skills. (*See* Def.'s Mem. at 2 n. 3.) Thus, the background check, which measures CRM skills, is "necessary to safe and efficient job performance." *Smith*, 99 F.3d at 1471.

Moreover, as noted above, a commercial airline is yielded a substantial degree of deference when its hiring decision affects public safety.

> When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminate against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job-related. On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related.... The job of airline flight officer is clearly such a job.

*Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir.1977) (quoting *Spurlock v. United Airlines, Inc.*, 475 F.2d 216, 219 (10th Cir.1972)). Accordingly, the Court concludes that Northwest has met both prongs of the business necessity test.

Although required to do so in order to maintain her claim, Ludwig has not presented sufficient evidence to rebut Northwest's business necessity defense. *See Albemarle*, 422 U.S. at 425, 95 S.Ct. 2362. She argues that the MAB and PCI are less discriminatory than the background check. Even if true, Northwest has presented ample evidence that the background check is a better indicator of pilot success than the MAB and PCI. (*See* Foushee Dep. 41–44; Kern Dep. at 35–36.) Notably, Ludwig has presented no evidence to the contrary. The Court therefore concludes that she

has failed to meet her burden of persuasion, particularly in light of the deference imparted to airlines in the hiring of commercial pilots. Accordingly, Ludwig's disparate impact claim is dismissed as a matter of law.

### 3. *Retaliation*

█ Ludwig alleges that she suffered from adverse employment action in direct retaliation for her decision to file an EEOC complaint, in violation of Title VII and the MHRA. As a threshold matter, Northwest's argues that Ludwig's claim should be dismissed because she failed to arbitrate the matter, as required under her collective bargaining agreement ("CBA"). The Court need not proceed too far with this analysis, for it appears that the Eighth Circuit strongly disfavors the enforcement of arbitration clauses that are imposed upon the employee, as in this case, by way of a CBA. *See Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 837 (8th Cir.1997) ("We have held that arbitration agreements contained within a CBA do not bar civil claims under Title VII."). The Court therefore concludes that Ludwig's retaliation claim need not be arbitrated.

█ Next, Northwest argues that even if Ludwig is not required to arbitrate, her claim is nonetheless preempted by the Railway Labor Act (RLA). The RLA provides the exclusive means by which minor labor disputes—disputes in which the parties seek to enforce existing contractual rights—are resolved. *See* 45 U.S.C. § 184; *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 439 (8th Cir.1998). Although Northwest's rights under the CBA are tangentially involved, Ludwig's retaliation claim arises independent of the CBA. That is, by bringing a claim under Title VII and the MHRA, Ludwig seeks to enforce federal and state statutory rights, not a contractual right contemplated by the CBA. *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1115 (8th Cir.1995). Thus, because Title VII and the MHRA are the

sources of the claim, rather than the CBA, the Railway Labor Act does not preempt Ludwig's retaliation claim. *See Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 256, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (holding that the RLA does not preempt claims to enforce rights independent of the collective bargaining agreement); *see also Taggart v. Trans World Airlines, Inc.,* 40 F.3d 269, 274–75 (8th Cir.1994) (holding that a state law discrimination claim is not preempted by RLA).

■ Accordingly, the Court turns to the merits of Ludwig's retaliation claim. Like discrimination claims under Title VII and MHRA, retaliation claims are analyzed under the *McDonnell Douglas* framework. *See Smith v. Riceland Foods, Inc.,* 151 F.3d 813, 818 (8th Cir.1998); *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn.1983). In order to prove a prima facie case of retaliation, Ludwig must demonstrate that: 1) she engaged in statutorily protected activity; 2) she suffered an adverse employment action; and 3) there was a causal connection between the adverse employment action and the protected activity. *See Smith,* 151 F.3d at 818. Northwest argues that Ludwig has not established a prima facie case of retaliation because she cannot meet the second and third factors. The Court agrees.

In the statement of facts in her Memorandum in Opposition to Summary Judgment, Ludwig alleges the following instances of adverse employment action by Northwest, all of which occurred after she was eliminated from the 1995 hiring process: 1) unfair denial of her transfer request; 2) unnecessary "coaching" regarding sick leave; 3) unreasonable investigation of a potential security breach; 4) initiating several unwarranted "see me" notes; 5) requiring her—for the first time in her extended tenure at Northwest—to undergo drug testing; 6) sending her a "threatening" letter asking her to stop "enlisting support" from other Northwest personnel for her EEOC com-

plaint; and 7) making phone calls to her home questioning her performance and attendance. (*See* Pl.'s Mem. at 13–15.) However, in the argument section of her Memorandum Ludwig focuses on Northwest's actions during the 1995 pilot hiring process as evidence of retaliation. For example, she describes the relevant adverse employment action as the "loss of a job opportunity." (Pl.'s Mem. at 24.) Her argument makes clear that the job opportunity to which she refers was her elimination from the pilot hiring process. In particular, she alleges that "Plaintiff's job performance and disciplinary record was altered to make it appear more negative. Defendant, in essence, began to carefully scrutinize Plaintiff to find a basis to prevent her from being a Northwest Pilot." (*Id.*) These allegations, even if true, simply cannot constitute retaliation because they would have occurred before Ludwig filed her first EEOC complaint, the filing of which allegedly propagated the retaliation. Notwithstanding this bewildering inconsistency, the Court will examine each of Ludwig's post-EEOC filing allegations in determining whether she suffered any kind of adverse employment action.

■ Although Ludwig did not suffer from blatant adverse employment action, such as a demotion or termination, the Court recognizes that employer action need not rise to that level to be considered adverse. *See Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997). At the same time, however, mere inconvenience or unhappiness on the part of the employee will not lead to a finding of actionable adverse employment action. *See id.; Enowmbitang v. Seagate Technology, Inc.,* 148 F.3d 970, 973 (8th Cir.1998). Rather, "[a]dverse employment action is that which materially alters the terms or conditions of the plaintiff's employment." *Enowmbitang,* 148 F.3d at 973. Such actions traditionally include "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and

compensating. *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997); *see also Dollis v. Rubin,* 77 F.3d 777, 782 (5th Cir.1995). Based on this standard, the Court concludes that none of the instances on which Ludwig relies constitute adverse employment action.

■ Ludwig's first claimed instance of adverse action was Northwest's denial of her request for a supervisor transfer. Ludwig has provided very little information about this alleged denial. In fact, she has completely failed to show that such a denial was even atypical, such that it might be considered adverse. For example, Ludwig said that she "believed" that there were Northwest employees who had successfully transferred to different supervisors. (Ludwig Dep. at 92.) Yet, she could only name one employee, Ruth Jordan, who she thought might have been granted such a transfer. (*See id.*) Even if she could establish that every employee except her had been transferred upon request, such a denial simply does not constitute a material change in her employment status because as a result of the denial, Ludwig merely maintained the status quo.

■ Second, Ludwig contends that she was "coached" regarding sick leave. When pressed at her deposition, however, she admitted that she had not actually been coached, and conceded that even if she had been, such action is not generally considered to be disciplinary in nature.[6] (*See* Ludwig Dep. at 93.) Given this admission, the Court would be hard-pressed to find that "attempted coaching" constituted adverse or any other kind of employment action. Moreover, there is ample evidence that Ludwig did in fact have an attendance problem. (*See* Def.'s Exs. 10–16; Emeott Aff.Ex. E.) Holding that "coaching," when warranted, constitutes an adverse employment action would emasculate employers and dissuade them from not only discussing legitimate performance concerns with their employees, but also from helping their employees perform better in the future. The Court will not impose such a sweeping limitation on employers.

■ Third, Ludwig contends that she suffered from adverse employment action when she was investigated for an alleged security breach in Boston. Once again, although it is not disputed that she was investigated for this incident, nothing ever came of it. She was never reprimanded, formally or informally, nor were the terms of her employment altered. Even if Northwest investigated the incident with unusual vigor,[7] there was no attendant material alteration of the terms or conditions of her employment. Furthermore, Northwest is required by law to investigate potential breaches of security in order to ensure the "highest possible degree of safety in the public interest." 49 U.S.C. § 44701(d)(1)(A). The Court will not, without cause, inhibit investigations into such matters.

■ Fourth, Ludwig contends that she received several "see me" notes, which she perceived to be negative and damaging. Although Ludwig asserts that she received "five or six" such notes, when pressed at her deposition, she could only recall two specific instances in which she received such notes. (*See* Ludwig Dep. at 71–72.) Even if she could provide specific information about all of the notes she claimed she has received, such notes are not necessarily disciplinary or adverse in nature. (*See* Def.'s Ex. 30.) Moreover, Ludwig has provided no information demonstrating that the notes materially, or even immate-

---

**6.** Ludwig has attempted to establish that the "attempted coaching" was in fact disciplinary because it was used against her in the pilot selection process. (*See* Ludwig Dep. at 93.) Once again, any Northwest conduct that occurred before Ludwig filed her first EEOC complaint cannot be considered retaliatory for purposes of this lawsuit.

**7.** Ludwig's union representative, Yvonne Thompson, characterized Northwest's investigation a "Witch Hunt." (Pl's.Ex. N.)

rially, changed the terms or conditions of her employment.

 Fifth, Ludwig alleges that Northwest retaliated against her by forcing her to undergo two drug tests for the first time in her 25 year tenure. Northwest does not dispute that she was given the drug tests, but explains that random drug tests are administered by an outside organization, at its discretion. (*See* Tice Dep. at 51–54.) Ludwig has provided no evidence to the contrary. Because Northwest did not control the decision to test Ludwig for drugs or alcohol, such testing could not have been retaliatory in nature. Moreover, two drug tests over 25 years, regardless of when they occurred, do not evince adverse action. Without more, their timing can only be deemed a coincidence.[8]

 Sixth, Ludwig alleges that Robert Tice sent her a "threatening" letter asking her to stop "enlisting support" from other Northwest personnel for her EEOC complaint. (Pl.'s Mem. at 13.) This description of the letter is incomplete and misleading. In fact, the letter asks Ludwig to stop using company resources to enlist support and to refrain from contacting employees while they are on duty. (*See* Pl.'s Ex. C.) Tice explained that such conduct was specifically prohibited by Northwest's Rules of Conduct, with which Ludwig was required to comply. (*See id.*) Thus, through the letter, Tice was simply attempting to stop Ludwig from doing something that she was already bound not to do. This does not constitute a material alteration of the terms and conditions of her employment. Indeed, the letter is most accurately viewed as upholding the terms and conditions of her employment. Holding otherwise would completely debilitate employers by preventing them from enforcing their internal rules of conduct. Moreover, the letter was not in itself disciplinary. Rather, it merely cautioned Ludwig that further similar conduct would subject her to "potential disciplinary action." (*Id.*)

 Finally, Ludwig contends that Northwest management made numerous telephone calls to her home questioning her performance and attendance. The record is completely void of any evidence supporting this contention. Even if proven, such conduct does not constitute adverse employment action. *See Munday v. Waste Management of N. Am., Inc.,* 126 F.3d 239, 243 (4th Cir.1997) (holding that an adverse employment action does not encompass a situation in which the employer essentially instructed its employees to harass the plaintiff).

In sum, although Ludwig claims that she has been retaliated against by Northwest, the instances she cites in support of her allegation are either unsupported by the record or insufficient to constitute adverse employment actions. Ludwig admits that throughout the period in question she never received a termination notice or a Level 1 notice, was never given a decision making leave, and was never coached. (*See* Ludwig Dep. 72–73, 93–95.) Further, the actions in question never affected her salary, duties, or position at Northwest. In other words, the terms and conditions of her employment were never altered. Therefore, the Court finds that Ludwig has failed to make a prima facie case of retaliation. Accordingly, Northwest is entitled to dismissal of this count as a matter of law.

### C. Negligence and Intentional Infliction of Emotional Distress

In addition to alleging Title VII and MHRA violations, Ludwig has alleged neg-

---

**8.** This certainly does not mean that drug testing can never be considered an adverse employment action. *See, e.g., Adams v. American Airlines, Inc.,* 2000 WL 14399, at *5 (10th Cir.2000) ("We assume, without deciding, that, if Adams could prove in this case that the IVRS was deliberately manipulated such that Adams was subjected to significantly more drug tests than she otherwise would have been absent such manipulation, such evidence could establish adverse employment action for purposes of her prima facie case of retaliation.").

ligent training, negligent hiring, negligent supervision, and intentional infliction of emotional distress ("IIED"), all under Minnesota law. Northwest argues that Ludwig's common law claims should be dismissed because they are preempted by the MHRA and, in any event, she has not presented evidence in support of her claims.

Notwithstanding the issue of preemption, it is abundantly clear that Ludwig's negligence claims cannot stand. Her negligent training claim fails because Minnesota does not recognize such a theory of recovery. *See Mandy v. Minnesota Mining & Mfg.*, 940 F.Supp. 1463, 1473 (D.Minn.1996) (citing *M.L. v. Magnuson*, 531 N.W.2d 849, 856 (Minn.Ct.App.1995)). Ludwig's negligent hiring and supervision claims likewise fail because she has not alleged the type of injury necessary to maintain such claims, namely, bodily injury or the threat of bodily injury. *See id.* at 1471.

Plaintiff's IIED claim also fails. In order to prevail on such a claim, the plaintiff must establish that: 1) the defendant's conduct was extreme and outrageous; 2) the conduct was intentional or reckless; and 3) it caused severe emotional distress. *See Hubbard*, 330 N.W.2d at 438–439. "The operation of this tort is sharply limited to cases involving particularly egregious facts." *Id.* at 439. Ludwig has not presented such facts here.

In order to be deemed "extreme and outrageous," conduct "must be 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" *Id.* (quoting *Haagenson v. Nat'l Farmers Union Property and Cas. Co.*, 277 N.W.2d 648, 652 n. 3 (Minn.1979)). Northwest's actions fall far below this deliberately high standard. Ludwig's alleged emotional distress apparently stems from Northwest's "numerous false accusations, investigations and general harassment." (Pl.'s Mem. at 34.) The Court will assume that Ludwig is referring to the alleged instances of retaliation discussed above. The Court concludes that as a matter of law, these incidences, either individually or collectively, cannot be considered extreme and outrageous. Rather, the conduct complained of constituted Northwest's reasonable investigations into potential security matters and routine communications with its employee. Thus, neither the nature of the actions, nor their content can be viewed as utterly intolerable to the civilized community. *See Hubbard*, 330 N.W.2d at 439–40 (holding that dismissal as a matter of law was appropriate when the conduct constituted no more than employment discipline and written and verbal criticism of the plaintiff's job performance, even if intended to harass). Indeed, the civilized community would probably prefer that Northwest be overly careful when it comes to airline safety.

Even if Ludwig could establish that Northwest's conduct was extreme and outrageous, there is no proof that she has suffered from "severe emotional distress." The only evidence of any physical reaction to her situation comes from her deposition in which she claims to have experienced emotional upset, distress, loss of reputation, decreased energy, sleeplessness, and the like. (*See* Ludwig Dep. at 97–100.) These symptoms, even if substantiated, do not rise to the level necessary to maintain this claim. Ludwig has never seen a doctor, missed work, or filed a worker's compensation claim as a result of her symptoms. Therefore, it can hardly be said that she suffers from distress "so severe that [she cannot] be expected to endure it." *Id.* at 439. Thus, the Court concludes that as a matter of law, Ludwig has not established the elements necessary to maintain a claim of intentional infliction of emotional distress.

## CONCLUSION

For the foregoing reasons, and upon all of the files, records, and proceedings herein, the Court grants Defendant Northwest's Motion for Summary Judgment.

Accordingly, **IT IS HEREBY OR-DERED** that:

1. Defendant Northwest Airlines, Inc.'s Motion for Summary Judgment is (Clerk Doc. No. 56) is **GRANTED**; and

2. Plaintiff Susan Ludwig's Complaint (Clerk Doc. No. 1) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED AC-CORDINGLY.**